723 So.2d 1250 (1998)
ALFA MUTUAL INSURANCE COMPANY
v.
Richard Charles ROUSH et al.
1950232.
Supreme Court of Alabama.
September 11, 1998.
*1251 Thomas M. Galloway, Jr., and Robert H. Smith of Collins, Galloway & Smith, Mobile, for appellant, on original submission.
Joseph M. Brown, Jr., Andrew T. Citrin, Kelli D. Taylor, and David G. Wirtes, Jr., of Cunningham, Bounds, Yance, Crowder & Brown, L.L.C., Mobile, for appellees, on original submission.
Thomas M. Galloway, Jr., and Robert H. Smith of Galloway, Smith, Wettermark & Everest, Mobile; and William P. Gray, Jr., of Gray & Jauregui, Montgomery, for appellant, on application for rehearing.
Joseph M. Brown, Jr., and David G. Wirtes, Jr., of Cunningham, Bounds, Yance, Crowder & Brown, L.L.C., Mobile, for appellees, on application for rehearing.
Michael L. Roberts of Cusimano, Keener, Roberts & Kimberley, P.C., Gadsden, for amicus cuiae Alabama Trial Lawyers Ass'n, on application for rehearing.

On Application for Rehearing
PER CURIAM.
The opinion of July 2, 1998, is withdrawn and the following is substituted therefor.
Alfa Mutual Insurance Company ("Alfa") appeals from a judgment entered upon a jury verdict in favor of the plaintiffs Richard Charles Roush, Randy Earl Townsend, and Sea Breeze Seafood, Inc., on claims alleging wrongful acts on the part of Alfa's agent Roland Patronas. We reverse and remand.
Roush, Townsend, and Sea Breeze sued Alfa and Patronas, alleging that Patronas, as Alfa's agent, had purported to sell them workers' compensation insurance from a "pool coverage" insurer; that Patronas converted their premium payment for his own use and misrepresented to them that he had procured the insurance for them; and that *1252 Alfa was vicariously responsible for Patronas's misconduct. The plaintiffs further alleged that Alfa had wantonly and recklessly failed to supervise Patronas and that Alfa had wantonly encouraged and required its agents to sell pool insurance coverage for its own benefit without providing any safeguards for the insureds.
The trial court denied Alfa's summary judgment motions, and the case went to trial on the issues of vicarious liability and wantonness. Alfa moved for a directed verdict at the close of the evidence and renewed the directed verdict motion at the close of all the evidence. The trial court denied these motions. [1] The jury returned a verdict in favor of the plaintiffs, awarding them $100,000 in compensatory damages and $1,000,000 in punitive damages. Alfa moved for a JNOV or, in the alternative, a new trial or a remittitur of the damages awards. The court denied that motion and entered a judgment on the verdict. Alfa appeals from the denial of its directed verdict and JNOV motions.
A directed verdict is proper if the nonmoving party has not presented substantial evidence regarding some element essential to the claim or if there is no disputed issue of fact upon which reasonable persons could differ. Teague v. Adams, 638 So.2d 836 (Ala.1994). The court applies this same standard to a motion for a JNOV. Williams v. Allstate Ins. Co., 591 So.2d 38 (Ala.1991). When reviewing the trial court's ruling on the motion, we must view the evidence most favorably toward the nonmovant to determine whether there was sufficient evidence to create an issue of fact for the jury. Bussey v. John Deere Co., 531 So.2d 860 (Ala. 1988). With these standards of review in mind, we note the following facts from the record:
In 1979, Alfa hired Roland Patronas as its agent, under an exclusive agency contract, which prohibited Patronas from writing any insurance other than Alfa policies and Alfa-approved pool insurance policies. The approved pool insurance was available through the National Council on Compensation Insurance, Inc. ("NCCI"); the Alabama Insurance Underwriters Association ("AIUA"); and the National Flood Insurance Program. Alfa did not write pool insurance coverage.
Alfa provided Patronas with an office and an Alfa business sign, as well as business equipment and office personnel. Alfa also provided Patronas with preprinted insurance application forms for both Alfa Insurance and pool insurance. Alfa and Patronas shared the expense of television, radio, and billboard advertisements for Alfa, including a billboard in the Grand Bay area that featured Patronas's picture. Some of these advertisements included the slogan "One call, one agent, one less hassle"; and Patronas explained in his testimony at trial that, throughout his career with Alfa, he had represented to the public that he was the "one-stop" shopping center for insurance purchasers. Patronas also explained that Alfa had encouraged him to write pool coverage for his clients if Alfa could not provide a policy they needed; and that by his doing so, Alfa could avoid losing customers that it could not directly insure. Alfa did not publicly distinguish itself from the insurers providing pool coverage and did not otherwise inform its customers that it would not be responsible for pool coverage written by its agents.
Before August 1993, Alfa's "field procedure manual" outlined a strict system for controlling, monitoring, and auditing how agents handled Alfa's money. Alfa agents were required to produce a field receipt for any Alfa money they received, and an Alfa secretary and/or customer service representative maintained a daily transaction sheet to record all of the money that was brought in for Alfa. There were fixed Alfa procedures for handling all receipts of Alfa's money in any form. Alfa established a bank account for Patronas and required him, or his secretary, to deposit all of Alfa's money into that account within 24 hours of receiving it. Alfa *1253 did not, however, have any safeguards for handling money received from the sale of pool coverage; it had no procedures for the daily accounting for such money, nor did it conduct any audits to monitor the sale of pool insurance coverage. Alfa agents were not required to keep any records regarding the sale of pool insurance policies to Alfa customers.
In 1992, Patronas received a telephone call from Richard Roush, a client who had recently established a new business, Sea Breeze Seafood, Inc. Roush told Patronas that a representative from the Alabama Department of Industrial Relations had informed him that the corporation was required to obtain workers' compensation insurance. Patronas met with Roush and Roush's business partner, Randy Townsend, on the premises of Sea Breeze and told them that he would "take care of" their workers' compensation insurance; however, Patronas did not inform Roush and Townsend of the fact that Alfa did not write workers' compensation insurance and that he could obtain coverage for them only through a pool insurance provider. Roush wrote a $2,824 check from Sea Breeze's account, made payable to Patronas, for the insurance premium. During the course of the meeting, Patronas also sold Roush and Townsend, on behalf of Sea Breeze, Alfa policies for general liability, products-liability, and automobile insurance.
Patronas subsequently wrote the Alfa liability and automobile insurance policies for Sea Breeze, collected premiums for these policies, and forwarded the money to Alfa, in accordance with Alfa's procedures for reporting sales. However, Patronas did not procure the workers' compensation coverage for Sea Breeze; instead, he cashed the Sea Breeze check, converted the funds for his personal use, and then misrepresented to Roush that he had procured the workers' compensation insurance.
Approximately two months later, a Sea Breeze employee suffered an on-the-job injury and sought workers' compensation benefits. Roush, under the mistaken belief that Patronas had procured workers' compensation coverage for Sea Breeze, completed an incident report form and returned it to Alfa's Grand Bay office. One month later, a second employee sought workers' compensation for a work-related injury; Roush followed the same procedure.
Roush and Townsend subsequently began receiving the medical bills for services rendered to Sea Breeze's two injured employees. Roush asked Patronas when Alfa would begin paying the medical bills. Patronas represented to Roush that the workers' compensation policy had not been issued yet, but that the bills would be taken care of eventually. Patronas suggested that Roush have Sea Breeze pay the bills and then wait until the end of the year, or until the claims were processed, to get a refund. Patronas also suggested that Sea Breeze could avoid an increase in its workers' compensation premium rates by paying the claims itself and not submitting any claims to Alfa.
Soon thereafter, a representative from the Department of Industrial Relations again contacted Roush to determine whether Sea Breeze had obtained workers' compensation coverage. Roush gave the representative Patronas's telephone number; when Patronas received a call from the Department of Industrial Relations representative to verify Sea Breeze's coverage, he told the representative that Sea Breeze did indeed have workers' compensation coverage and gave her a false policy number.
On July 29, 1993, Jerry Grace, Alfa's district manager in Mobile, received a letter from a woman named Janice Stewart. Ms. Stewart's letter stated that she had applied for certain pool insurance coverage through Patronas two years earlier, that Patronas had purported to obtain this coverage for her, and that he had cashed her $3,471 premium check. Ms. Stewart's letter further stated that she had never received a copy of the policy and that Patronas had refused to answer her inquiries about the coverage.
Grace forwarded Stewart's letter to Alfa's internal audit director, Connie Whitecotton, who received it on August 2, 1993. On that same day, Whitecotton assigned Tommy Fikes, a certified fraud examiner and senior auditor at Alfa, to investigate Patronas's business activities. Fikes began an audit of *1254 Patronas's Grand Bay office on August 4, and on that day Patronas was given a two-week suspension.
On August 5, 1993, Fikes met with two Alfa customer service representatives at Alfa's Grand Bay "service center." Fikes learned that Sea Breeze had attempted to file with Alfa two claims for benefits under a policy of workers' compensation insurance that Patronas had promised to procure for Sea Breeze. Both customer service representatives were under the impression that Patronas had actually obtained the insurance, and one of them informed Fikes that both Roush and Townsend believed Patronas had done so. Fikes noted that the Sea Breeze file had no record of any such insurance.
Grace instructed Fikes to find out whether Sea Breeze had workers' compensation coverage. Fikes visited Townsend at his home; he learned from Townsend that Roush believed Patronas had obtained the coverage for Sea Breeze. Fikes admitted to Townsend that the workers' compensation policy was not listed in the file and that he did not know whether Sea Breeze had the coverage. Fikes told Townsend that he would check into the matter and report back to him.
On August 9, 1993, an Alfa investigator telephoned NCCI to inquire whether Sea Breeze or Townsend had workers' compensation insurance with NCCI and learned that NCCI had no record of such insurance under either name. Fikes then telephoned to determine whether there was NCCI coverage under Roush's name; he learned that there was no such coverage. Fikes telephoned Townsend on August 10 and asked Townsend to provide a copy of the premium check.
On August 18, 1993, Townsend telephoned Fikes and informed Fikes that Patronas had confessed to Roush that he had not used the premium check to buy workers' compensation insurance for Sea Breeze. Townsend asked Fikes what Alfa was going to do about it, and Fikes told Townsend he would consult Alfa's legal department. Ms. Whitecotton then telephoned Townsend and informed him that "Alfa wanted to make him whole" and that someone from Alfa would contact him to negotiate how Alfa could make him whole.
On August 19, 1993, Terry McCollum, Alfa's senior vice president of claims, was notified of the suspicions against Patronas. McCollum immediately assigned a claims adjuster, Terry Barnes, to contact Patronas's other clients and determine whether Patronas had converted any of their premium payments for his own use. McCollum instructed Barnes to find out what Patronas had promised the clients and, if Patronas's promises had not been kept, to give the clients whatever coverage they had been promised, to pay whatever claims had been made, and to refund premiums where necessary.
Barnes contacted Roush and Townsend on August 19, 1993, requesting that they provide him documentation regarding the medical bills and lost wages of the two Sea Breeze workers who had made workers' compensation claims. After several conversations with Barnes over the next few days, Roush and Townsend demanded that Alfa provide coverage for the workers' compensation claims and guarantee that payment of these claims would create no problems with their personal insurance coverage. They also demanded that Alfa reimburse them for the premium they had paid to Patronas and pay them each $20,000. After Roush and Townsend had this conversation with Barnes, a representative of the Department of Industrial Relations informed Roush and Townsend that the Department was aware that Sea Breeze did not have workers' compensation insurance. Townsend and Roush then hired a lawyer. When Barnes contacted them shortly thereafter to accept their demands, they told him they had hired a lawyer. Alfa terminated Patronas's employment on August 27, 1993. Townsend and Roush filed this lawsuit five days later, on September 1, 1993.
Alfa subsequently learned that Patronas had stolen over $83,000 from Alfa customers who had sought pool insurance through him. Alfa reported Patronas's thefts to the Mobile County district attorney. Patronas ultimately pleaded guilty to four counts of theft by deception in the first degree, one count of theft by deception in the second degree, and one count of theft by deception in the third degree. Patronas was sentenced to five *1255 years' probation and was ordered to pay restitution of $56,674.
The trial court presented to the jury two theories upon which the plaintiffs sought punitive and compensatory damages: (1) that Alfa was vicariously liable under § 6-11-27, Ala.Code 1975, for Patronas's acts and (2) that Alfa had wantonly failed to supervise Patronas's sale of pool insurance coverage and was directly liable for its own failure. Alfa argues that neither theory was supported by the evidence and that the trial court thus erred in denying its motions for directed verdict and JNOV.

I. Vicarious Liability
Alfa first argues that it is not vicariously liable under § 6-11-27 for Patronas's theft of Sea Breeze's insurance premium and his misrepresentations to Roush and Townsend. Section 6-11-27(a) provides, in pertinent part:
"(a) A principal, employer, or other master shall not be liable for punitive damages for intentional wrongful conduct or conduct involving malice based upon acts or omissions of an agent, employee, or servant of said principal, employer, or master unless the principal, employer, or master either: (i) knew or should have known of the unfitness of the agent, employee, or servant, and employed him or continued to employ him, or used his services without proper instruction with a disregard of the rights or safety of others; or (ii) authorized the wrongful conduct; or (iii) ratified the wrongful conduct; or unless the acts of the agent, servant or employee were calculated to or did benefit the principal, employer or other master ...."
(Emphasis added.)
Thus, an employer may be "vicariously liable for acts of its employee that were done for the employer's benefit, i.e., acts done in the line and scope of employment or... acts done for the furtherance of the employer's interest." Potts v. BE & K Constr. Co., 604 So.2d 398, 400 (Ala.1992). It is clear that Alfa expressly authorized and encouraged its agents to sell pool insurance coverage to Alfa customers who needed a kind of insurance coverage that Alfa could not write. An Alfa agent who obtained pool insurance coverage for a customer could, at the same time, attempt to sell that customer the kinds of insurance Alfa could write. Moreover, Alfa compiled customer lists and customer-identification data through those agents who obtained pool insurance coverage for Alfa customers, thereby generating the opportunity to solicit further business from these customers in the future. Thus, by encouraging its agents to sell pool insurance coverage, Alfa could market itself as a "one stop" insurance center, thereby developing customer loyalty and expanding its base of contacts for selling more of its policies.
When Patronas was an Alfa agent, Alfa had a strict and elaborate system of safeguards to prevent an agent from misappropriating the premiums for Alfa policies that an agent is able to sell in the course of obtaining pool insurance coverage for customers. [2] However, at that time, Alfa did not require an accounting from an agent who obtained pool insurance coverage for a customer; it had no form of precaution to discourage an agent from pocketing the premium the customer paid for pool insurance coverage. Instead, Alfa relied solely upon the pool insurance providers to monitor the sale of these policies by Alfa agents, avoiding the extra expense or inconvenience of providing its own "backup" safeguard.
It is evident how Alfa directly benefited from its encouraging Patronas to obtain pool insurance coverage for Alfa's customers without Alfa's providing any means of monitoring his performance. Roush contacted Patronas for the sole purpose of obtaining workers' compensation insurance for Sea Breeze; he was not seeking any other kind of coverage. However, when Patronas visited Roush to collect the $2,824 workers' compensation premium check, he was able to sell Roush and *1256 Townsend three separate Alfa policies. Alfa's lack of supervision of Patronas's "sale" of the pool insurance policy enabled him to steal the premium intended for that policy, while Alfa's elaborate system of monitoring the sales of its own policies ensured that it would receive the premiums from those sales. The evidence was sufficient to support a finding that Alfa encouraged Patronas to sell pool insurance policies; that it provided no supervision of his sales; and that, in this regard, Alfa acted purely for its own profit. The trial court thus correctly denied Alfa's motions for directed verdict and JNOV on the issue of Alfa's vicarious liability for Patronas's misconduct.

II. Direct Liability
Alfa next argues that the trial court erred in denying its motions for a directed verdict and later its motion for a JNOV on the plaintiffs' claims that Alfa acted wantonly in encouraging Patronas to sell pool insurance coverage but not supervising his sales. This Court has previously observed that § 6-11-27 modifies the common-law rule of vicarious liability by requiring proof of a higher degree of culpability on the part of the principal. Thus, as a logical matter, plaintiffs who meet the statutory requirement for vicarious liability will, in many cases, also have established the elements of a claim alleging wantonness in the hiring and supervision of the agent. Northwestern Mut. Life Ins. Co. v. Sheridan, 630 So.2d 384 (Ala.1993). We agree, however, that this is not true in every case; a plaintiff who establishes a principal's vicarious liability for its agent's acts does not automatically establish a claim of wantonness against the principal.
We agree that the evidence would support a finding that Alfa was heedless in encouraging its agents to sell pool insurance coverage in order to procure more business for Alfa, without establishing any form of agent accountability for the premiums paid for the pool insurance coverage. However, the evidence is not sufficient in itself to establish that Alfa wantonly encouraged this practice. To prove that, the plaintiffs had to present evidence that Alfa knew that the practice would likely or probably result in the harm or loss that Patronas caused. "Wantonness" is statutorily defined as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala.Code 1975, § 6-11-20(b)(3). "Wantonness" has been defined by this Court as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result. Bozeman v. Central Bank of the South, 646 So.2d 601 (Ala.1994). To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff. Joseph v. Staggs, 519 So.2d 952 (Ala.1988). We pause here to note the concern expressed by the bench and bar over the definition of wantonness set out in Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145 (Ala.1987). Certain language in Lynn Strickland suggested that a specific design or intent to injure the plaintiff was an element of a claim for wantonness. To the extent that Lynn Strickland deviates from the statutory definition of wantonness, as followed by this Court, it is hereby overruled.
Although Alfa did not provide its own safeguards against an agent's stealing pool insurance premiums, it instructed its agents to comply with whatever regulations a pool insurer required for the sale of its policies. The record shows that Alfa agents normally dealt directly with the pool insurers in procuring pool insurance and that they abided by those insurers' instructions in reporting sales and transferring premiums. It is undisputed that before Patronas's actions became apparent, Alfa had received no complaints about agents' converting pool insurance coverage premiums for their own use and had no notice that any Alfa agent had ever done that. Moreover, it is clear that Alfa did not know, or have reason to suspect, that Patronas was a dishonest or "rogue" agent and would scheme to steal pool insurance coverage premiums from Alfa customers. On the contrary, the record is replete with testimony indicating that Patronas was a trusted Alfa employee, that he was well respected by his customers and colleagues, and that he was popular *1257 and active in community affairs. It is well established that news of Patronas's wrongdoing came as a shock to those who knew him personally and professionally. It is also clear that once Alfa received the first notice of possible wrongdoing on the part of Patronas, it acted quickly to uncover the facts about his thefts, to rectify any damage he had caused, and to remove him from its employment.
After carefully reviewing the evidence in the record, we agree that it does not support a finding that Alfa knew that its lack of supervision over the sale of pool insurance policies would likely or probably result in Patronas's theft of pool insurance policy premiums. The trial court, therefore, erred in denying Alfa's motion for a directed verdict, which was argued with specificity, and, later, its motion for a JNOV, as to the claim of wantonness.
As we have discussed, the plaintiffs sought damages based upon the claim that Alfa was both vicariously liable for Patronas's acts and directly liable for its own failure to supervise Patronas. The claim alleging a wanton failure to supervise was not supported by the evidence and should not have been presented to the jury. When a jury returns a general verdict upon two or more claims, as it did here, it is not possible for this Court to determine which of the claims the jury found to be meritorious. Therefore, when the trial court submits to the jury a "good count"one that is supported by the evidenceand a "bad count" one that is not supported by the evidence and the jury returns a general verdict, this Court cannot presume that the verdict was returned on the good count. In such a case, a judgment entered upon the verdict must be reversed. See, Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981); see, also, St. Clair Federal Sav. Bank v. Rozelle, 653 So.2d 986 (Ala.1995). The jury did not specify which claim it based its verdict upon, and we cannot presume that it was based solely upon the "good" count, i.e., the claim that Alfa was vicariously liable under § 6-11-27 for Patronas's intentional acts. The jury could have based its verdict, awarding compensatory and punitive damages, solely upon the "bad" count, i.e., the claim that Alfa had wantonly failed to supervise Patronas. The judgment is, therefore, reversed, and the cause is remanded for a new trial.
OPINION OF JULY 2, 1998, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; REVERSED AND REMANDED.
KENNEDY and LYONS, JJ., concur.
HOUSTON and COOK, JJ., concur specially.
ALMON and SHORES, JJ., concur as to Part I; as to Part II, dissent in part and concur in the order remanding for a new trial.
HOOPER, C.J., and SEE, J., dissent as to Part I; concur in part as to Part II; and dissent from the order in Part II remanding for a new trial.
HOUSTON, Justice (concurring specially).
I dissented in Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala.1987), based on the distinction between negligence and wantonness. I wrote, at 510 So.2d at 148-49:
"There is a view, a generally accepted view, which I would adopt, that negligence is conductconduct which falls below the standard established by law for the protection of others against unreasonable risk of harm....
"....
"Since I view negligence as conduct, I would hold that the same action or inaction which constitutes negligence also constitutes wantonness if the tortfeasor is conscious of his inaction or action and is conscious that by such inaction or action injury will likely or probably result."
(Citations omitted.)
Although Chief Justice Torbert and Justice Steagall joined my dissent, the majority of the Court held:
"Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability....

*1258 "....
"`... Willful and wanton conduct should not be confused with negligence. It has been correctly stated that the two concepts are as "unmixable as oil and water."'"
510 So.2d at 145-46. This became the law of Alabama in Lynn Strickland, and the Legislature in 1987 adopted this Lynn Strickland definition of wantonness in Ala.Code 1975, § 6-11-20(b)(3). I now adhere to the majority's distinction between negligence and wantonness. See Coca-Cola Bottling Co. United, Inc. v. Stripling, 622 So.2d 882, 884-85 (Ala.1993).
Having said that, however, I note again, as I have in the past, that the Court, in Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., supra, at 145, muddied the waters by stating that "wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act." Those words suggest willful or intentional wrongdoing, not wantonness. The Court today overrules Lynn Strickland to the extent that this particular language from that case is inconsistent with the statutory definition of wantonness. This should eliminate any unnecessary confusion in future cases.
I concur with that portion of the per curiam opinion holding that the evidence was sufficient to support a finding of vicarious liability on Alfa's part. I also concur with respect to that portion of the opinion holding that the evidence was insufficient to establish wantonness. The judgment is due to be reversed on the authority of Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981).
COOK, Justice (concurring specially).
I concur in Part I of the per curiam opinion holding that the count seeking to impose vicarious liability on Alfa was properly submitted to the jury. I also concur in Part II, which addresses the wantonness count and concludes that the plaintiffs did not present sufficient evidence to submit the wantonness count to the jury. I write specially to express my agreement with the overruling of Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145 (Ala.1987), to the extent that that case infused the definition of "wantonness" with the concept of intent. My disagreement with the concept of wantonness as expressed in Lynn Strickland is based upon the recognition that Lynn Strickland tends to treat "knowledge" and "intent" as synonymous terms. The Court today distinguishes these terms by pointing out that to establish wantonness it is not necessary to prove that the defendant harbored a specific design or intent to injure the plaintiff. 723 So.2d at 1256. It is only required that the plaintiff prove that the defendant caused harm by the conscious doing of some act or the conscious omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury would likely or probably result. See Bozeman v. Central Bank of the South, 646 So.2d 601 (Ala.1994).
ALMON, Justice (concurring as to Part I; as to Part II, dissenting in part and concurring in the order remanding for a new trial).
I respectfully dissent from the reversal. I agree that the count seeking to impose vicarious liability on Alfa was properly submitted to the jury, and I therefore concur as to Part I of the per curiam opinion. I disagree, however, with the per curiam opinion insofar as it holds that there was not substantial evidence supporting the allegation that Alfa should be held directly responsible for wantonly failing to provide adequate safeguards for the handling of pool insurance premiums. Because I agree that the vicarious liability count was properly submitted to the jury, I agree that, in light of the majority's decision to reverse the judgment, the case is due to be retried on the vicarious liability count. For that reason, I concur in the order remanding for a new trial.
I agree with the majority's decision to overrule Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145 (Ala.1987), regarding the standard for proof of wantonness. Although I concurred in Lynn Strickland, I see in reviewing the arguments in this case that some of its statements are slightly misleading, at *1259 least when taken out of context. Part of this confusion comes from the fact that the Lynn Strickland opinion was contrasting negligence, on the one hand, with wanton, reckless, or willful conduct, on the other hand. The following statements, without actually saying so, tend to imply that wantonness requires proof of intentional wrongdoing:
"Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury. The element of intent, or knowledge, is not present in simple negligence, and the element of intent does not raise a person's conduct to merely a greater degree of negligence as, for instance, gross negligence....
"Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act."

510 So.2d at 145 (emphasis added). The first two portions of the text that I have emphasized are correct statements of the law, but notice that the second emphasized phrase is simply saying what is not present in negligence; it does not say that "intent" is an element of wantonness. The last statement is correct insofar as it says that wantonness requires a "conscious ... act," but incorrect insofar as it requires, for wantonness, "a purpose or design, a[n] ... intentional act." These words describe willful or intentional wrongdoing, not wantonness.
In my judgment, substantial evidence of wantonness is apparent from the per curiam opinion. Alfa established effective safeguards for the handling of money received to pay premiums on Alfa policies, but, as the per curiam opinion states, "Alfa did not, however, have any safeguards for handling money received from the sale of pool coverage." 723 So.2d at 1253. The very fact that Alfa established controls for the handling of its money by its agents and employees is evidence that it was acting "while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury [would] likely or probably result." Bozeman v. Central Bank of the South, 646 So.2d 601, 603 (Ala.1994). That is, those controls are evidence of Alfa's consciousness that there is a likelihood that unsupervised handling of money will result in theft or misappropriation. Why should it be deemed any less conscious of that same possibility in regard to the pool insurance money?
The per curiam opinion states, "Alfa's lack of supervision of Patronas's `sale' of the pool insurance policy enabled him to steal the premium intended for that policy, while Alfa's elaborate system of monitoring the sales of its own policies ensured that it would receive the premiums from those sales." 723 So.2d at 1256. (Emphasis added.) The very contrast between the "lack of supervision" and the "elaborate system of monitoring" seems, to me, to provide a sustainable inference of wantonness. Indeed, I agree that Alfa "enabled" Patronas to steal the premiums, and I think the jury was properly allowed to conclude that it wantonly did so.
The per curiam opinion states that "Alfa relied solely upon the pool insurance providers to monitor the sale of these policies by Alfa agents, avoiding the extra expense or inconvenience of providing its own `backup' safeguard." 723 So.2d at 1255. It is not clear to me how the pool insurers could have adequately monitored the offices of an Alfa agent such as Patronas, who was selling pool insurance only incidentally to, and in furtherance of, the agent's sales of Alfa insurance policies. It seems to me that it is Alfa that was in a position to institute the "primary" safeguard and that the pool insurers, if anything, might have sought some "backup" safeguard. Certainly, at the least, "avoiding the extra expense or inconvenience" of adding the pool insurance premiums to the existing safeguards is the kind of failure to act, with knowledge of likely consequences, that can fairly be characterized as wantonness.
The following passage from the per curiam opinion further illustrates that the plaintiffs presented substantial evidence of wantonness:
"We agree that the evidence would support a finding that Alfa was heedless in encouraging its agents to sell pool insurance coverage in order to procure more *1260 business for Alfa, without establishing any form of agent accountability for the premiums paid for the pool insurance coverage. However, the evidence is not sufficient in itself to establish that Alfa wantonly encouraged this practice. To prove that, the plaintiffs had to present evidence that Alfa knew that the practice would likely or probably result in the harm or loss that Patronas caused."
723 So.2d at 1256 (emphasis added). To my understanding, "heedless" conduct is "wanton" conduct. See, e.g., Berry v. Fife, 590 So.2d 884 (Ala.1991). Alfa's wanton conduct was not the act of "encourag[ing][the] practice" of selling pool insurance; it was the act of doing so without instituting any of the safeguards it considered important in regard to its own insurance premiums. I agree that harm must be likely or probable, but I am not sure that the terms "likely or probably" here means "more probable than not," and that term certainly does not mean "almost certain." Is it not a jury question if there is a sufficient degree of probability for a reasonable, prudent person to guard against it?
Further, I agree that "the plaintiffs had to present evidence that Alfa knew that the practice would likely or probably result in" harm or loss, but not necessarily "the harm or loss that Patronas caused." 723 So.2d at 1256. The per curiam opinion also states that the evidence "does not support a finding that Alfa knew that its lack of supervision over the sale of pool insurance policies would likely or probably result in Patronas's theft of pool insurance policy premiums." 723 So.2d at 1257. (Emphasis added.) This sounds as though Alfa was not conscious of the risk that agents would steal pool money unless it knew exactly which agent might do so. This thought is also expressed in the statement that testimony indicated that "Patronas was a trusted Alfa employee, that he was well respected by his customers and colleagues, and that he was popular and active in community affairs." 723 So.2d at 1256. I do not take the plaintiffs to be suggesting that Alfa should have instituted controls over pool money only in Patronas's office. Rather, the wantonness is in the failure to attend on an institutional basis to the likelihood that, somewhere among Alfa's agents, one would eventually fall prey to the temptation to abscond with some of the unsupervised pool insurance premiums.
The per curiam opinion cites the evidence indicating that Alfa had not previously received complaints about agents' converting pool insurance premiums. I agree that this evidence tends to negate the inference of wantonness, but I do not believe that it conclusively precludes the possibility of a finding of wantonness. To state the point hyperbolically, the fact that no one had previously stolen money that Alfa had left lying unattended did not mean that it was unlikely that anyone ever would. Also, I agree that Alfa's prompt and effective actions upon receiving notice of Patronas's failure to place pool insurance for Roush, Townsend, and Sea Breeze is evidence tending against a finding of culpable conduct by Alfa. Again, however, the jury found that Alfa was wanton, and the fact that it acted promptly to rectify its agent's wrongdoing does not absolve it from liability for its "heedless" conduct that made such wrongdoing more likely.
I believe this case is unlike Cessna Aircraft Co. v. Trzcinski, 682 So.2d 17 (Ala. 1996). The Cessna safety harness that failed and thereby contributed to Trzcinski's injury was improperly stitched, but there was "no evidence presented that the seamstress knowingly left out the stitching or acted with a conscious or reckless disregard in manufacturing the harness." 682 So.2d at 20-21. As the opinion explains, Cessna had carefully designed and tested the harnesses and had established inspection procedures to safeguard against faulty construction of individual harnesses. In short, the evidence established only simple negligence in an isolated case, not a wanton failure to institute adequate safeguards.
Furthermore, I see a distinction between this case and Harco Drugs, Inc. v. Holloway, 669 So.2d 878 (Ala.1995). Harco Drugs considered, but did not implement, a procedure for its employees to verify that the pharmacist had correctly filled a prescription. The number of incidents of misfilled prescriptions was very small, and many of those incidents were not the pharmacist's fault (such as the cashier's giving a customer another customer's prescription). Dissenting in Harco *1261 Drugs, I expressed the opinion that there was not substantial evidence of wantonness. To analogize Harco Drugs to the facts of this case, it would be as though Harco had instituted safeguards regarding the filling of some prescriptions but not others. Moreover, the majority found evidence of wantonness in Harco Drugs; that seems inconsistent with the holding here that there was not substantial evidence of wantonness.
For the foregoing reasons, I respectfully dissent from the reversal of the judgment. I concur in the result of remanding the cause for a new trial on the vicarious liability count.
SHORES, J., concurs.
SEE, Justice (dissenting as to Part I; concurring in part as to Part II; and dissenting from the order in Part II remanding for a new trial).
I respectfully dissent from Part I of the main opinion, which holds that on the evidence presented Alfa Mutual Insurance Company ("Alfa") could be held vicariously liable for the actions of Patronas in selling a non-Alfa insurance policy. I concur in Part II of the main opinion insofar as it holds that the evidence regarding Alfa's conduct did not establish wantonness. Because Alfa was entitled to a judgment as to both counts, however, I dissent from that portion of Part II of the main opinion remanding for a new trial.
This case involves Patronas's conversion of premium payments that he received for the sale of a workers' compensation pool insurance policy to be issued by the National Council on Compensation Insurance, Inc. ("NCCI").[3] The main opinion holds that Alfa is liable for Patronas's sale of NCCI policies, under Ala.Code 1975, § 6-11-27(a), because "the acts of the agent[, Patronas,]... were calculated to or did benefit the principal[, Alfa]." 723 So.2d at 1255 (emphasis added). The main opinion interprets the word "benefit" to include indirect marketing benefits from Patronas's sale of the NCCI policy that I deem insufficient to support the imposition of vicarious liability on Alfa.
Alfa had no right to, and did not, receive or retain any of the premiums paid on the NCCI policy, or any other direct financial benefit with respect to that policy. Cf. In re Tuskegee Inst. v. May Refrigeration Co., 344 So.2d 156, 158 (Ala.1977) (stating that a "master's" retention of a financial benefit generated by its "servant's" conduct constitutes a ratification of the servant's conduct that also subjects the master to liability for the servant's conduct). Any indirect marketing benefit Alfa might have received by allowing Patronas to contract with NCCI to sell NCCI's pool insurance policies in addition to Alfa automobile and liability policies is no greater than the benefit any casualty insurance company would receive from an independent agent's sale of noncasualty policies in addition to the company's casualty policies. This collateral advantage derived from a policy Alfa did not issue and from premiums it did not collect is too remote, too indefinite, and too speculative a benefit on which to premise Alfa's vicarious liability under § 6-11-27(a).
The plaintiffs quite properly seek relief against Patronas, who pocketed their premiums. There may well have been an unmet responsibility on the part of NCCI to monitor the sale of its policy. But, the plaintiffs fail to demonstrate that Alfa benefited from the alleged wrong.
HOOPER, C.J., concurs.
NOTES
[1] This case was tried before the amendment of Rule 50, Ala. R. Civ. P., effective October 1, 1995, which renames the "motion for directed verdict" as a "motion for judgment as a matter of law," and renames the "motion for judgment notwithstanding the verdict" as a "renewal of the motion for a judgment as a matter of law." See Committee Comments to October 1, 1995, Amendment to Rule 50.
[2] Alfa's field procedure manual contains a detailed system for controlling, monitoring, and auditing the manner in which its agents handle Alfa money. The agent, the customer service representative, and the secretary in every Alfa office are required to keep a detailed daily account of Alfa receipts and transactions, and Alfa had a system of audits in place to discover fraud, misconduct, or theft on the part of an agent.
[3] NCCI, not Alfa, had the responsibility to monitor the sale of the workers' compensation policies.