[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 304 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 305 
Werner Feil d/b/a E W Enterprises sued The Wittern Group, Inc. ("Wittern"); Continental Vending Cooperative, Inc. ("Continental"); VendNet, Inc.; Fawn Vendors, Inc.; and Inland Finance Company on November 21, 1997, alleging claims for breach of contract, breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, negligence, wantonness, misrepresentation, and fraudulent suppression. These claims all arose arising out of Feil's purchase of vending machines.[1] Feil alleged in his complaint that Wittern was a holding company and that Continental, VendNet, Fawn Vendors, and Inland Finance were acting as its agents.[2]
The defendants answered the complaint on January 14, 1998. Inland Finance also asserted a counterclaim against Feil on that date, alleging a breach of an installment sales contract and a security agreement. The defendants moved for a summary judgment on March 16, 1999. Inland Finance also moved for a summary judgment on its counterclaim on that date. On November 8, 1999, the court entered a summary judgment in favor of all defendants on all counts. The court also entered a summary judgment in favor of Inland Finance on its counterclaim and scheduled a damages hearing for November 22, 1999. The damages hearing was rescheduled several times; ultimately the court entered an order awarding Inland Finance "$32,873.03 principal, $1,647.24 interest, and a reasonable attorney's fee of $10,000 plus court costs."[3] Feil appeals. *Page 306 
This case was transferred to this court by the supreme court, pursuant to § 12-2-7, Ala. Code 1975.
In reviewing a summary judgment, we use the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Bussey v. John Deere Co., 531 So.2d 860,862 (Ala. 1988); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Westv. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). This court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant.Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990).
Feil, who at the time of the hearing was 60 years old, had been employed as a comptroller, as a bookkeeper, and as a real-estate agent. He has a high-school education, as well as technical training in accounting. He first considered the vending business in May or June 1996 when he saw an advertisement in a local newspaper. Feil telephoned the toll-free number listed in the advertisement and spoke with someone at Continental. Thereafter, Greg Poe, an employee of Continental, contacted Feil and scheduled an appointment to meet with him. Poe traveled to Foley and met there with Feil and his wife. Feil testified that he informed Poe that he was "fishing" for a business to get into. Poe informed Feil that he represented Continental and that Continental was in the business of selling vending machines. At this meeting, Poe gave Feil a brochure entitled "Making Cents." Poe asked Feil to study the brochure and to then contact him.
The "Making Cents" brochure contains information about the vending industry and about Continental. It contains a "10 Steps to Vending Success" guarantee, which describes 10 services that Continental provides to its affiliates, including a market-feasibility study and maintenance training. The brochure also provides a potential-profit analysis; however, it contains the following disclaimers: 1) "Neither Continental Vending Co-operative, Inc. nor its representatives can guarantee profit or sales levels. This illustration is used only as an example." 2) "Because each operator is different, this is NOT to be understood as a guarantee. The above is a hypothetical earnings chart and is not to be interpreted that any location will sell as many or as few sales per week as shown."
Feil testified that Poe told him Continental would "provide the machinery, provide the training, and anything necessary to get you going in this business" and that he "would be sufficiently trained to go into the business." He also stated that Poe told him that he "would be sufficiently and adequately prepared and trained to service [his] machines" and that this "training was to take place upon the delivery of the machines at [his] location."
Feil testified that he studied the "Making Cents" brochure "extensively." He also telephoned other vendors affiliated with Continental, vendors referenced in the back of the brochure, and discussed with them their vending businesses and their experiences. He completed a credit *Page 307 
application and gave his authorization for Continental to conduct a market survey.
Approximately a week after his meeting with Poe, Feil met with Jim Doyle, who was also employed by Continental. Feil testified that he and Doyle discussed the vending business and that he expressed some concern to Doyle regarding his lack of mechanical skills. Feil stated that Doyle told him that he would be sufficiently trained to service the machines and that the machines were under warranty. Feil also testified that Doyle told him that Continental had a service-support group located in Calera that would assist him when needed. Feil, however, also testified that Doyle told him that he (Feil) would be responsible for servicing and maintaining the machines himself. Before Feil purchased any machines, Doyle performed a market survey on behalf of Continental and spent several days soliciting business and establishing accounts for Feil.
Feil signed a purchase order on July 1, 1996, to purchase 19 vending machines from Continental. Included in this purchase order were four 20-select "Deli Junior" cold-food machines. The purchase order contained a one-year warranty limited to repair and replacement of defective parts. On July 8, 1996, Feil entered into an installment sales contract and a security agreement with Continental for the purchase of the vending machines, for $76,720. He made a down payment of $20,245, leaving a balance owed of $56,475. The sales contract contained a merger clause, as well as a disclaimer of any warranty of merchantability or fitness for a particular purpose and any other express or implied warranties. Continental assigned its interest in the sales contract and the security agreement to Inland Finance.
The vending machines were delivered to Feil in August 1996. Don Parks and Kyle Watson, employees of Continental, spent three days setting the machines up at various locations where Feil had accounts. When Feil received his machines, he also received an operator's manual, which referenced Continental's one-year limited parts-and-labor warranty; a service manual for a cold-food merchandiser; a safety manual and installation guidelines; and a one-year limited manufacturer's warranty from VendNet. Feil testified that Parks and Watson instructed him how to stock and service the machines, how to set the prices in the machines, and how to retrieve money from the machines.
Feil began experiencing problems with the machines, primarily with the Deli Juniors, shortly after receiving them and getting them installed. He testified that he had to replace dollar-bill validators, sensor boards, sensor switches, circuit boards, door-latch assemblies, door switches, keypad assemblies, a "coin-cove validator," coin mechanisms, loading switches, and compressors. He stated that he replaced most of these items himself after receiving instructions over the telephone from representatives at Continental and VendNet. He also testified that Continental sent a representative to Foley "three or four" times when he was unable to replace parts on the machines. Feil testified that he was unable to replace the compressors on the cold-food machines and had to hire Rivieria Utilities to replace those parts. Continental brought Feil to Calera in February 1997 for training. He testified that he discussed with Continental representatives the problems that he was having with the machines and why those problems were occurring. He said the Continental representatives instructed him on how to solve those problems. He stated that VendNet supplied him with all the necessary replacement parts that he needed during the warranty period. Richard Masters, of Fawn Vendors, offered in June *Page 308 
1997 to replace Feil's 20-select Deli Juniors with 40-select Deli Juniors. Feil initially accepted this offer, by letter dated June 19, 1997. However, he testified that he did not follow through, because, he said, Fawn Vendors wanted him to sign a release relieving it of liability. He stated that the Deli Juniors did not function and were in storage.
 Breach-of-Contract Claim
Feil argues that the contract that existed between the parties consisted of oral representations made by the Continental representatives; representations contained in the "Making Cents" brochure and the operator's manual; and the installment sales contract. He contends that Continental represented to him that he would receive adequate training and support services for the repair and maintenance of the machines; that he relied on these representations in purchasing the machines; and that Continental breached the contract by failing to provide these services.
In order to recover on a breach-of-contract claim, the plaintiff must prove "`(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" State Farm Fire Cas. Co. v. Slade,747 So.2d 293, 303 (Ala. 1999), quoting Southern Med. Health Sys., Inc.v. Vaughn, 669 So.2d 98, 99 (Ala. 1995).
Feil testified that Poe told him he would be sufficiently and adequately trained to service and maintain his machines and that the training would take place upon delivery of the machines. Feil stated that he informed Doyle that he had some concerns regarding his own lack of mechanical skill and that Doyle represented to him that he would be sufficiently trained to service the machines and that Continental had a support-service group located in Calera that would assist him when needed.
Feil also points to passages from the "Making Cents" brochure and the operator's manual. The "Making Cents" brochure contains the following statements:
 "Our confidence in this business philosophy is evidenced by our exclusive `10 steps to Vending Success' guarantee. No one else in the industry will offer this type of no-obligation guarantee to you and there is good reason for that. . . . No one else will offer the type of program support system that Continental Vending Co-operative, Inc. offers.
". . . .
 "Maintenance Training: You will receive training for the on-going operation of your machines, assuring their long life potential profits.
". . . .
 "Equipment Delivery, Set-up, And Training: Our technician will assist you in your initial set-up, and ensure your satisfaction with the operation of your equipment. You will receive training for the on-going operation of your machines, assuring their long life and potential profits."
The operator's manual contains the following statement:
 "We train you in the procedures to disassemble and assemble a machine, explain each component of the machine, how to trouble shoot problems, and in the routine maintenance of the machines. This training will take an average of four hours; depending on your mechanical abilities. We do not rush affiliates in training. We will continue the equipment training until you feel confident that you can diagnose and repair your equipment."
The installment sales contract that Feil entered into with Continental and that was assigned to Inland Finance contains *Page 309 
the following merger clause: "This agreement constitutes the entire agreement between Buyer and Seller or Assigns. No warranties, express or implied and no representations, promises, or statements have been made by Seller other than what is expressly stated herein." Additionally, the purchase order Feil signed contains the following: "Neither Continental Vending Co-operative, Inc., nor its representatives have made any representations, commitments or inducements that are not specifically contained in either this Purchase Order; the Cooperative Vend Agreement; the Authorization for Market Survey; or the Second Interview Check List." Continental argues that Feil's breach-of-contract claim is barred by these clauses, because the alleged representations that Feil contends were breached are not contained in these documents. We agree.
Merger clauses operate to establish that a written agreement is a completely integrated document into which all previous and contemporaneous negotiations are merged. Crimson Indus., Inc. v.Kirkland, 736 So.2d 597 (Ala. 1999). Merger clauses are enforceable under state contract law and have been given effect in Alabama for years. CrownPontiac, Inc. v. McCarrell, 695 So.2d 615 (Ala. 1997). "While merger clauses do not bar parol evidence of fraud in the inducement of contracts, they are properly used to ensure that preliminary negotiations, whether oral or written[,] are either memorialized in the final contract or are not considered part of it." Id., at 618 (citation omitted); see also Infiniti of Mobile, Inc. v. Office, 727 So.2d 42
(Ala. 1999). Further, a person who signs a contract is on notice of those terms contained in the contract and is bound by those terms. PowerEquip. Co. v. First Alabama Bank, 585 So.2d 1291 (Ala. 1991).
In this case, the merger clauses contained in the installment sales contract and the purchase order are clear and unambiguous. Feil signed those two documents and is, therefore, bound by their terms. The clauses are enforceable and act to preclude recovery by Feil based on any alleged breach of oral or written representations that are not contained on those documents. Accordingly, the summary judgment was proper as to Feil's breach-of-contract claim, because he failed to establish that the representations allegedly breached were made a part of the agreement between him and Continental or its assignee, Inland Finance.
Assuming, however, that the alleged written and oral representations were part of the agreement, as Feil argues, we conclude that there was no material breach of the contract. Feil himself testified that when the machines were delivered Parks and Watson instructed him how to stock and service the machines, how to set the prices in the machines, and how to retrieve money from the machines. He stated that when he encountered mechanical problems with the machines he was able to fix them after receiving instructions from either Continental or VendNet over the telephone. He also stated that on several occasions a technician was sent to repair the machines. Finally, it is undisputed that Continental brought Feil to Calera for a training course and that he was given the opportunity to discuss with a Continental representative the various problems he was having with the machines.
As noted earlier, Feil did not specify which claims he asserted against which defendants. The summary judgment was proper as to the breach-of-contract claim to the extent that claim was asserted against Wittern, Fawn Vendors, and VendNet, because Feil presented absolutely no evidence as to the existence of a contract *Page 310 
between any parties other than Feil, Continental, and Inland Finance.
 Breach-of-Express-Warranty Claim
Feil argues that the defendants breached the express warranties provided by Continental and VendNet. To recover on his breach-of-express-warranty claim, Feil must show that "`the warranty failed of its essential purpose'; that either the dealer refused to repair or replace the malfunctioning component, or failed to do so `within a reasonable time.'" Lipham v. General Motors Corp.,665 So.2d 190, 192 (Ala. 1995), quoting Ag-Chem Equip. Co. v. LimestoneFarmers Coop, Inc., 567 So.2d 250 (Ala. 1990).
Continental provided the following express warranty:
 "Continental Vending Co-Operative, Inc.'s obligation and liability under the warranty expressly limited to repairing or replacing, at Seller's option, within twelve months after date of delivery, any part which upon our examination discloses to be defective. SELLERS MAKE NO OTHER WARRANTY, EXPRESS OR IMPLIED, AND MAKES [sic] NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. SELLER'S OBLIGATION UNDER THIS WARRANTY SHALL NOT INCLUDE ANY TRANSPORTATION CHARGES OR ANY LIABILITY, DIRECT OR INDIRECT, OR CONSEQUENTIAL DAMAGES OR DELAY.
 "If requested by Seller, products or parts for which a warranty claim is made are to be returned transportation prepaid to Seller. Any improper use, operation beyond capacity, substitution or parts not approved by Seller or any alteration or repair by others in such a manner as in Seller's judgement affects the product materially and adversely will void this warranty. No employee representing Seller is authorized to change this warranty in any way or to grant any other warranty."
The installment sales contract contains the following: "Buyer hereby acknowledges that prior to the sale the text of the Sellers [sic] warranty was made available for Buyer's review. Said warranty statement is a separate document and is not made a part of this installment sale contract and security agreement." Feil signed the purchase order, which contained this same warranty. He also initialed the interview checklist acknowledging his receipt of the warranty.
VendNet also provided the following express warranty:
 "Warranty Registration Card at left must have been mailed within 10 days of delivery date to qualify. Warranty period starts with receipt of Warranty Card and will be kept in our files.
 "This warranty does not apply when damage from mechanical, physical, electrical or water abuse results in causing the malfunction. Deterioration of paint, lights bulbs, ballasts or fuses, due to time are specifically exempted under this warranty.
 "VendNet, Inc., warrants each of its vending machines to the original purchaser for indoor use under the following provisions:
 "One-year Warranty: VendNet will replace or repair any part which fails due to a defect in material or workmanship.
"Five-year Warranty: Sealed refrigeration system.
 "Return failed component ONLY, shipping prepaid, to address above. We will repair or ship you a replacement. The customer shall be responsible for all costs incurred in the removal, reinstallation *Page 311 
and shipping of the product for repairs.
 "VendNet will assume no liability resulting from improper installation or use of this product. In no case shall the company be liable for any consequential damages for breach of this, or any other warranty expressed or implied whatsoever. This limitation as to consequential damages shall not apply in states where prohibited."
Feil testified that he completed the warranty registration card and returned it to VendNet.
After carefully reviewing the evidence, we conclude that Feil did not present substantial evidence indicating that the express warranties provided by Continental and VendNet failed their essential purpose. In fact, Feil himself testified that neither Continental nor VendNet ever failed or refused to supply him with replacement parts that he needed during the warranty period.
Feil also contends that the five-year warranty on the refrigeration system provided by VendNet was breached, because he was required to pay shipping costs and he incurred expenses when he had to have the compressors installed by Rivieria Utilities. The warranty, however, expressly states that Feil is responsible for all costs associated with shipping and reinstallation.
Finally, Feil, relying upon § 7-2-313, Ala. Code 1975, seems to argue that Continental made certain oral representations to him that also form the basis for his breach-of-express-warranty claim. However, recovery on any alleged breach of oral representations that purportedly form the basis of a warranty claim is precluded by the merger clause contained in the installment sales contract. Accordingly, the summary judgment was properly entered in favor of Continental and VendNet on Feil's breach-of-express-warranty claim. It was also properly entered in favor of the remaining defendants as to which that claim related, because the only express warranties provided to Feil were provided by Continental and VendNet.
 Breach-of-Implied-Warranty Claims
Feil argues that Continental breached the implied warranties of merchantability and fitness for a particular purpose. Continental argues that any implied warranties of merchantability and fitness for a particular purpose were successfully disclaimed. We agree.
Section 7-2-314, Ala. Code 1975, provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Section7-2-315 reads:
 "§ 7-2-315. Implied warranty: Fitness for particular purpose.
 "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose."
However, such a warranty may be disclaimed by the seller. Section7-2-316(2) provides:
 "(2) Subject to subsection (3), to exclude or modify the implied warranty of merchanta-bility or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicu-ous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that `There are no warranties *Page 312 
which extend beyond the description on the face hereof.'
"(3) Notwithstanding subsection (2):
 "(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like `as is,' `with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty. . . ."
Section 7-1-201(10), Ala. Code 1975 defines "conspicuous" as follows:
 "`Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals . . . is conspicuous. Language in the body of a form is `conspicuous' if it is in larger or other contrasting type or color. . . . Whether a term or clause is `conspicuous' or not is for decision by the court."
Any implied warranties by Continental that could have arisen from its sale of the machines to Feil were successfully disclaimed. The disclaimer found in the express warranty provided by Continental, as well as the disclaimer contained in the installment sales contract, satisfy the requirements of §§ 7-2-316(2) and 7-1-201(10). Accordingly, the summary judgment was properly entered in favor of Continental on Feil's breach-of-implied-warranty claim. Additionally, the remaining defendants were not the sellers of the machines and, therefore, the summary judgment was proper as to this claim insofar as it related to those parties.
 Negligence and Wantonness Claims
Feil next argues that the defendants negligently failed to properly manufacture the vending machines; recommended bad locations for placement of the vending machines; failed to provide promised training and sufficient support services; and failed to disclose that the cold-food machines were designed to be only "drawing cards." Feil cites no authority in support of these contentions. Rule 28(a)(5), Ala.R.App.P., requires an appellant to support his argument with relevant authority.Stephens v. Stephens, 718 So.2d 54 (Ala.Civ.App. 1998). When the appellant fails to comply with the minimum requirements of Rule 28(a)(5), this court will affirm. Jones v. Seibert, 624 So.2d 639 (Ala.Civ.App. 1993). We note that "even if Rule 28(a)(5) were not invoked, the record evidence would require affirmance" as to these claims. Id., at 640. Thus, the summary judgment is affirmed insofar as it relates to the negligence claims.
Feil also contends that the defendants were wanton with regard to the same acts or failures as to which he alleged negligence. Negligence and wantonness are two distinct causes of action. Ex parte Jackson,737 So.2d 452 (Ala. 1999). Our supreme court has stated:
 "`Wantonness' is statutorily defined as `[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others.' `Wantonness' has been defined by this Court as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result. To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff."
Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256 (Ala. 1998). After carefully reviewing the record, we conclude that Feil failed to present substantial evidence indicating that the defendants' conduct rose to the level of wantonness. Accordingly, the summary judgment was properly entered *Page 313 
in favor of the defendants on Feil's wantonness claims.
 Fraud Claims
Feil alleged three counts of fraud, including innocent or mistaken fraud, intentional fraud, and fraudulent suppression. Although neither artfully pleaded nor pleaded with any particularity, and not clearly set forth in Feil's brief, it appears that the factual allegations that make the basis of his fraud claims are contained in paragraph 10 of the complaint. We will address each allegation individually.
In order to recover on a claim of fraud, a plaintiff must prove: (1) a false representation; (2) concerning a material fact; (3) that was relied upon; and (4) damage occurring as a proximate result of the reliance. ArmyAviation Ctr. Fed. Credit Union v. Johnson, 716 So.2d 1250 (Ala.Civ.App. 1998). If the alleged fraud is based upon a promise to perform a certain act in the future, then the following two additional elements are required: "(1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive." Sides v. Drake, 719 So.2d 853, 855 (Ala.Civ.App. 1998).
A majority of Feil's fraud allegations are in the nature of promissory fraud. (1) Feil alleged that Continental misrepresented to him that it would provide adequate and sufficient training in the repair and operation of the vending machines and that it would provide substantial support services. The evidence presented indicates that when the machines were delivered and set up Feil received instruction on how to stock and service the machines, set the prices, and retrieve money from the machines. He testified that when he encountered mechanical problems, he received repair instructions over the telephone, from either Continental or VendNet. Additionally, on several occasions a technician was sent to Foley to repair the machines. On one occasion, Feil was brought to Calera by Continental for a training course in the repair and maintenance of the machines and he was given the opportunity to discuss with a Continental representative various problems that he was having with the machines. Further, Feil was assisted in the establishment of his initial accounts by Continental and he was provided materials, including various manuals, advertising materials, T-shirts, and business cards. We conclude that Feil failed to present substantial evidence of a misrepresentation, because the evidence indicates that Continental actually performed the acts alleged to have been promised.
(2) Feil alleged that Continental misrepresented to him that it would provide a warranty on the vending machine. This contention is wholly without merit; it is undisputed that Continental, as well as VendNet, provided warranties on the vending machines.
(3) Feil alleged that Continental misrepresented to him that it would provide a marketing analysis. Again, this contention is wholly without merit; it is undisputed that Continental performed a market survey. Feil even testified that he had "no criticism" of the survey.
(4) Feil alleged that Continental misrepresented to him that it would provide him with new vending machines. Again, this contention is meritless; the machines sold to Feil were new.
Feil's remaining fraud claims relate to the profitability of the machines. He alleged that Continental misrepresented to him the profitability of the machines for the first year. This alleged misrepresentation is apparently based on the profit/loss analysis contained in the "Making *Page 314 
Cents" brochure. The "Making Cents" brochure, however, contained several disclaimers in which Continental expressly stated that it did not guarantee profits or sales. Feil testified that he had read and studied this brochure "extensively." Further, he signed the purchase order containing the following disclaimer: "I have not been guaranteed any specific amount of profit." Finally, when asked if Continental guaranteed any profits, Feil responded, "[N]o, of course not."
Feil's final allegation of fraud is an alleged fraudulent-suppression of a material fact. To recover on a fraudulent-suppression claim, a plaintiff must prove "1) a duty to disclose the facts, 2) concealment or nondisclosure of material facts by the defendant, 3) inducement of the plaintiff to act, and 4) action by the plaintiff to his injury."Foremost Ins. Co. v. Parham, 693 So.2d at 409, 423 (Ala. 1997). Feil contends that Doyle represented to him that the cold-food machines were profitable and that there was a need for these machines. Feil testified that the cold-food machines failed to make a profit and that while he was in Calera at the training session Eric Wilson, an employee of Continental, informed him that the cold-food machines were intended only as "drawing cards." Feil argues that had he known the cold-food machines were intended only as "drawing cards" he would not have purchased them. Although Feil contends that in February 1997 he was informed that the cold-food machines were merely "drawing cards", he purchased an additional Deli-Junior cold-food machine in March 1997. Feil testified as follows:
 "Q. Did you find that the Deli Juniors were a drawing card to get you your snack machines installed in locations?
 "A. I personally didn't have that experience. I had one guy wanted the machine. That's why I bought that used machine. They requested it, because they were out in the country, and I said, `Well, I can get one for you.' But he requested it, so it wasn't a drawing card."
We conclude that, based on the fact Feil purchased a cold-food machine after he had been informed that the cold-food machines were merely "drawing cards," and based on his testimony quoted above, any alleged statement that the cold-food machines were merely "drawing cards" relates to an immaterial fact and, therefore, Feil's suppression claim must fail.
Accordingly, the trial court properly entered the summary judgment in favor of Continental on Feil's fraud claims. The summary judgment was also proper as to the remaining defendants, because none of those defendants had any contact with Feil before he purchased the machines.
 Inland Finance's Counterclaim
Feil testified that, because he was having problems with the vending machines, he unilaterally ceased making the monthly installment payments to Inland Finance in February 1998. Inland Finance counterclaimed against Feil, alleging a breach of the installment sales contract. The trial court entered a summary judgment in favor of Inland Finance on its counterclaim, awarding it "$32,873.03 principal, $1,647.24 interest, and a reasonable attorney's fee of $10,000 plus court costs."
Before the damages hearing on Inland Finance's counterclaim, Feil's attorney had requested that the defense attorney turn over his billing records. At the damages hearing, the defense attorney refused to turn over those records. Feil's attorney again requested the records so that the attorney fees requested could be verified. The defense attorney claimed that the billing records were privileged documents. The trial court concluded that the billing records were not relevant and that the *Page 315 
defense attorney was not required to produce them.
Feil argues that the billing records were not privileged material and should have been produced. We need not determine whether the billing records were confidential. "An award of attorney fees, where permissible, is a matter within the discretion of the trial court and will not be reversed on appeal absent a showing that the trial court abused its discretion." ISS Int'l Serv. Sys., Inc. v. Alabama Motor Express,Inc., 686 So. 1184, 1189 (Ala.Civ.App. 1996). After carefully reviewing the record, we conclude that the trial court had sufficient evidence from which it could fashion a reasonable attorney-fee award without reviewing the billing records. The defense attorney was questioned at length by Feil's attorney regarding his time and efforts expended in defending this case.
AFFIRMED.
Robertson, P.J., and Monroe, Crawley, and Thompson, JJ., concur.
[1] Feil did not specify that certain claims related to any particular defendant; rather, he asserted each claim against the defendants collectively.
[2] The vending machines were manufactured by Fawn Vendors, sold to Feil by Continental, and financed by Inland Finance. VendNet handled the warranty claims and parts sales.
[3] The court originally had entered an identical order on December 28, 1999, but it had vacated that order on January 10, 2000.