971 So.2d 652 (2007)
Ex parte Hattie RANDALL, an employee of the Mobile County Department of Human Resources.
(In re Robert D. Hernandez and Mary L. Hernandez, as surviving parents of their infant son, Douglas Hernandez, deceased
v.
Department of Human Resources of the State of Alabama et al.).
1050203.
Supreme Court of Alabama.
April 27, 2007.
*653 Troy King, atty. gen., Kevin Newsom, deputy atty. gen., and Sharon E. Ficquette and James E. Long, asst. attys. gen., Department of Human Resources, for petitioner.
J. Bernard Brannan, Jr., of The Brannan Law Firm, P.C., Montgomery, for respondents.
BOLIN, Justice.
Hattie Randall, a social worker employed in Mobile County by the Department of Human Resources ("the Department"), petitions this Court for a writ of mandamus directing the Montgomery Circuit Court to vacate its order denying her motion for a summary judgment based on State-agent immunity in this wrongful-death action against her and to enter a summary judgment in her favor based on that defense. We grant the petition.

Facts
Douglas Hernandez, the two-month-old son of Robert D. and Mary L. Hernandez, died on August 30, 2002, while he was in the care of Melinda Poplin, who was operating Tiny Tots Family Day Care. Toxicology reports revealed the presence of several over-the-counter cough and cold medications in Douglas's blood, and his death was ultimately ruled a homicide. Douglas's parents sued the Department, its commissioner, and Hattie Randall, who at the time the parents filed the action had been employed by the Department for 18 years.[1] The Hernandezes alleged wrongful death and fraud and sought injunctive relief. Randall moved for a summary judgment, asserting as a defense State-agent immunity. After a hearing, the trial court denied Randall's motion. Randall filed this petition for the writ of mandamus.
*654 At the time of the events made the basis of this action, Randall was serving as a day-care-licensing consultant for the Department. Randall's duties included visiting licensed and prospective licensed group-day-care home providers to evaluate the homes for purposes of licensing. At that time, Poplin was operating Tiny Tots Family Day Care out of her home and was licensed to care for as many as 12 children ranging in ages from infancy to 12 years old. Poplin had been a licensed group-day-care home operator since 1993.
Poplin had been notified by the Department in October 2001 that her license would soon expire and that she needed to submit an application for renewal. Poplin completed the license-renewal application and submitted it to the Department on February 13, 2002. Randall made an unannounced visit to the Poplin home on April 9, 2002, to evaluate it for the purpose of determining whether to renew Poplin's license.[2] During the evaluation, Randall reviewed certain records that Poplin was required to maintain pursuant to the Department's minimum standards.[3] Section F.3.g. of those standards require that the home-day-care provider maintain certain records relating to the children in the provider's care, including (1) each child's preadmission form, (2) written medication authorizations, and (3) immunization certificates. The day-care provider must maintain these records two years after a child leaves the day-care home. Section E.2.d(1) of the minimum standards provides as follows regarding the written medication-authorization forms:
"No medication or medical procedures (prescription or over-the-counter) shall be administered without a written, signed authorization form from the child's parent(s)/guardian(s). Blanket authorization forms are prohibited. The authorization form shall include time(s) and date(s) to be administered, dosage, storage instructions, and specific *655 directions for administering the medication/medical procedure, such as give by mouth, apply to skin, inhale, drops in eyes, etc. An authorization form shall be valid for no more than seven (7) days, unless accompanied by a written physician's statement."
(Emphasis in original.)
The licensing consultant is provided with a "Children's Records Checklist" to be completed when reviewing the records of the day-care provider. Randall determined that Poplin's records were not in compliance with the minimum standards. She indicated on the records checklist that Poplin had immunization certificates for only 2 of the 12 children in her care and that she had no preadmission forms for any of the children. Additionally, Poplin had no written medication-authorization forms on file for the children. However, Randall indicated on the records checklist that the written medication-authorization forms were not applicable to Poplin under the minimum standards. Randall stated that a written medication-authorization form is to be included in a child's file only if the day-care provider has administered medication to that child. Randall testified as follows regarding the medication-authorization forms:
"Q. Why did you determine that [the medication-authorization form] wasn't applicable?
"A. Minimum standards states that two forms are required for a child's checklist or to complete a child's file, and that is the preadmission form and the immunization certificate.
"Q. Why would that form have a blank for medical authorization on it?
"A. If it was needed.
"Q. Well, what would be a circumstance when it would be needed when you were doing this evaluation?
"A. If a child had been given medication, then the form should be there.
"Q. So was it your belief when you were doing this record check that she had never given a child medication?
"A. She had no medical authorization forms.
"Q. Yes, ma'am. And so as an evaluation person, did you believe that she had never given the children medication?
"A. When I do an evaluation, I check her files and I check what [is] there.
"Q. Okay.
"A. And if there are no forms, then she has not given any medication because the form is not there.
"Q. Okay. And how long would she beif she had given medication to children and she had filled out those forms, how long would she have to keep them?
"A. A file is kept as long as a child is there.
"Q. They don't have to keep a file any longer than how long the child is there?
"A. If the child has not been in the home in over two years then they do not have to keep the files.
"Q. Okay. So if the child leaves, then they've got to keep the file for two years?
"A. Yes, sir.
". . . .
"Q. Did you look at any files on children other than the ones that were actually there at the time?
"A. No, sir.
". . . .
"Q. When you found that the child the children that were currently there had no record of ever having a medical authorization for medication, did that and with your experience of 18 years *656 with the department, did that trigger any thought that, you know, maybe she's not keeping these records?
"A. No, sir.
"Q. Did it lead you to believe, you know, I might better look at these other children that used to be here to see if she's ever given medication to a child in her day care?
"A. No, sir."
Randall marked the "Compliance" box on a child-care home-licensing evaluation form with a "D," indicating that Randall had discussed with Poplin compliance with the Department's standard requiring a written authorization form before she could administer medication to a child in her care. Randall explained in her affidavit that she had discussed with Poplin the requirement of administering medication only with written parental authorization and that Poplin confirmed that she was compliant with the policy. Further, Poplin had a written operating policy for her home day care indicating that she administered medication only with written parental authorization.
Section E.2.d(2) of the Department's minimum standards requires that any prescription or over-the-counter drug to be administered to a child in day care be in its original container and be labeled appropriately with specific instructions for administering the drug and that a measuring device be provided if the medication requires measuring. Section E.2.d(3) requires that all medication in the home be kept in a locked cabinet or other container. Section E.2.d(4) requires that all medications be returned to the child's parent or guardian when no longer needed.
Randall marked the "Compliance" box on the child-care home-licensing evaluation form with an "S," indicating that Poplin had certified that she had a measuring device for administering medications and that medications were returned to parents or guardians when they were no longer needed. Randall indicated that Poplin was in violation of the requirement that all medications in the day-care home be kept in a locked cabinet or container by marking the "Non-compliance" box with a "D," indicating that she had discussed with Poplin the violation of this standard. Randall testified regarding her determinations as to the minimum standards as follows:
"Q. Okay. You've got an S here under medicines returned to child's parent when no longer needed, and you've got an S there instead of a D?
"A. Yes, sir.
"Q. What did you do more than discuss that?
". . . .
"A. Ms. Poplin told me that she gave the medicine back, and we discussed that that was the procedure. We discussed that that was the procedure.
"Q. Did not that send up a red flag that there were no medical authorizations if she told you that she was sending medicine back with the parents when they didn't need it any more?
"A. Let me correct my statement. We discussed howwhat the procedure was if she received medication, then the procedure was to give it back to the parent.
"Q. And again, my
"A. And we discussed that.
"Q. Okay. And again my question there are 20 entries on this page under health all the way down through care of infants. There are 20 entries, and you've got D for every one of them except you certified in some method measuring device provided and you certified in some method medicines returned *657 to child's parent when no longer needed.
"A. Yes, sir.
"Q. So that was certified to you that medicines are returned to [a] child's parent when no longer needed?
"A. If she has to use medication, yes, she is to return it to the parent.
"Q. But she certified to you that she had been returning it to the parent?
"A. That's not what that says.
"Q. Well, tell me why it has an S and everything else on that page is a D except for the measuring device?
"A. That was what was used. That was thethe code that was used for that particular.
"Q. And I understand that's the code. It's obvious to me looking at it that that's the code that was used. But my question is you were the one that used it; why did you use that in that particular case instead of the D?
"A. Because in discussing that, if I recall, she said if medicine is ever used, she returned it to the parent.
"Q. Okay. You couldn't find any evidence from any of the records you reviewed that she'd ever given medicine, though, could you?
"A. According to the form, that was not applicable.
"Q. I understand, ma'am. But you were the one that filled out the form. So I need you to tell me what you found or didn't find, not what the form says because you filled out the form.
"A. Okay. Had a form been there, then I would have noted that there was one.
"Q. Okay. The medicines that you did see that you discussed with her that they should be locked, did you make any investigation to see if any of those medicines were in the name of anybody other than household members in that household?
"A. No, sir.
". . . .
"Q. Since there were no forms filled out showing that parents had given authorization to give any children medicine, did you think it might be important to look at the medicines that were there in the house to see if any of them were in some name other than a household member and that they might have been for a child?
"A. I did not look to see who the medicine was for.
"Q. Okay.
"A. There was medicine there, but I did not look to see whose name was on it.
"Q. And my question is did you think that might be important to do?
"A. We were not required to look.
"Q. That was not your job; is that what you're saying when you say not required?
"A. No, that's not what I said. We were not required to look at each medicine bottle to verify whose medicine it was because there was no form."
Section H.2. of the Department's minimum standards requires that a group-day-care home have at least the following caregivers: the licensee, an assistant caregiver, and at least two substitutes. Section H.3. provides that when seven or more children are present in the day-care home, "at least two (2) adult caregivers shall be present and supervising the children. This shall include the licensee and the assistant caregiver. If a substitute is used, either the licensee or the assistant caregiver shall be present and supervising the children." Section H.6. requires that an assistant caregiver receive at least 12 *658 hours of training in such areas as child development, health and safety, quality child care and licensing, language development, and positive discipline and guidance. The substitutes are not required to have any specialized training.
Dana Pope was Poplin's assistant caregiver. Clifton Poplin, Poplin's husband, and Margaret Hackney were listed as Poplin's substitutes in the operating policy for the day-care home. Pope worked in the group-day-care home from 7:30 a.m. to 5:30 p.m. She was primarily responsible for caring for the infants; Poplin cared primarily for the older children. Pope generally took a three-hour lunch break, which began at noon. During the hours of Pope's lunch break Clifton would come home from his outside employment to assist in the group-day-care home. Because Clifton was employed outside the group-day-care home,[4] Randall required Poplin to provide a letter from Clifton's employer stating that Clifton would be available to assist in the day-care home when needed. Although Randall knew that Clifton would be used as a substitute, she testified that she had no knowledge as to the extent to which Clifton would be used as a substitute. Nevertheless, Randall testified that if Clifton substituted for the assistant caregiver three hours a day five days a week, Poplin would not be violating the Department's minimum standards regarding the use of substitutes. She stated that there was no regulation regarding how often a substitute could be used by a licensee so long as either the licensee or the assistant caregiver is present while the substitute is being used.
Randall marked the "Compliance" boxes with a "D" on the "Child Care Home Licensing Evaluation" form, indicating that she had discussed with Poplin the requirements that at least two adults be present and supervising the children when seven or more children are present and that either the licensee or assistant caregiver must be present when a substitute is being used. However, Randall found that Poplin was not compliant with the requirement that certain records relating to the assistant caregiver be kept. She indicated that she discussed Poplin's noncompliance with this requirement by marking the "Non-Compliance" box with a "D."
Randall made a follow-up visit to Poplin's home on May 29, 2002. Poplin had at this time corrected the majority of the deficiencies found during the April 9, 2002, inspection and had so verified to Randall. The correction of the deficiencies was noted by Randall on the deficiency report.
Randall noted other deficiencies during the May 29, 2002, visit relating to certain records of Hackney and Clifton that Poplin was required to keep. Randall again completed a deficiency report. Poplin corrected these deficiencies by forwarding verification of these records to Randall, and Randall subsequently noted that the deficiencies on the May 29, 2002, deficiency report had been corrected. Randall then recommended to her supervisors that Poplin's home-day-care license be renewed. The Department renewed Poplin's home-day-care license on July 26, 2002.
The evidence presented at the hearing on Randall's summary-judgment motion revealed the following facts. Douglas was born on June 17, 2002. His parents, Robert and Mary Hernandez, contacted the Department to inquire about licensed home-day-care facilities and were provided a list. The parents selected Poplin's day *659 care, and Douglas began attending Poplin's home day care on August 12, 2002. On August 30, 2002, Robert took Douglas to Poplin's home day care and signed him in at 7:06 a.m. Douglas was sleeping and had recently been fed when he arrived. Douglas woke up approximately 20 minutes later. As was the normal routine, Poplin and Pope took the children outside for approximately 45 minutes to an hour before lunch. The children were then brought inside and fed.
Poplin testified that Douglas was fussy and that she administered some Tylenol brand acetaminophen to him after lunch. Poplin denies administering any other medication to Douglas. Douglas and the other infants were then put down for their naps, and Pope left the day care to begin her lunch break. Poplin testified that at 2:30 p.m. she heard Douglas cry out and she went into the nap room to check on him. She stated that she put Douglas's pacifier back in his mouth and remained with him until he went back to sleep. Poplin resumed other activities in the home but testified that she could hear Douglas and the infants in the nap room.
Poplin returned to the nap room shortly after 3:00 p.m. and saw that Douglas was blue and he was not breathing. Poplin called for Pope, who had just returned from her lunch break, to telephone emergency 911. As Pope telephoned 911, Poplin began performing CPR on Douglas. Douglas vomited several times as Poplin was performing CPR on him. The emergency personnel arrived and transported Douglas to the hospital, where he was pronounced dead at 3:50 p.m.
Dr. Leroy Riddick investigated Douglas's death for the Alabama Department of Forensic Sciences. An initial autopsy report issued on August 31, 2002, indicated that the cause of Douglas's death was "aspiration of a foreign material" and that the manner of death was "undetermined." Toxicology results issued on December 20, 2002, revealed the presence of dextromethorphan, chlorpheniramine, diphenhydramine, atropine, and metoclopramide in Douglas's blood. Dr. Riddick testified that dextromethorphan is a cough suppressant and that chlorpheniramine and diphenhydramine are common antihistamines found in over-the-counter cold medications. Atropine was used during resuscitative measures at the hospital, and metoclopramide is used to treat gastric reflux.
Dr. Riddick continued his investigation into Douglas's death and consulted other experts. On June 10, 2003, Dr. Riddick amended his original finding as to the cause of death to state the following:
"Further study of and reflection on this case necessitates my putting `Acute Drug Toxicity' as a contributory cause of death and to indicate that, in my opinion, the aspiration was due to the depression of the central nervous system from the drug toxicity. Exactly when and how the infant received the drugs are investigative matters, which remain unclear to me. Thus, the manner [of death] remains undetermined."
Subsequently, Dr. Riddick performed additional tests on the material Douglas had vomited onto the shirt that he was wearing at the time of his death. The tests revealed the presence of the drug guaifenesin, a cough suppressant. Based on the results of these tests, Dr. Riddick, on September 9, 2003, changed his determination as to the manner of death to state the following:
"The report of toxicological analysis of the shirt worn by the subject is attached. The presence of the drugs in the stains on the shirt from gastric contents and the high levels in the blood indicate that the infant had received the *660 drugs recently. The manner of death is, therefore, changed to Homicide."
Dr. Riddick testified as follows regarding his decision to change the manner of Douglas's death to homicide:
"[T]he central question early on was when did this child receive these drugs. That was it. That was the reasonI wasn't certain. I knew the half-life of the drugs was really shorter than if the child had received the drugs prior to seven o'clock in the morning. This sort of clinched it. That sometime after seven o'clock in the morning, while the child was at the day-care center, [the child] received these drugs. My definition of a homicide is one or more people are responsible for another person's death. The child was not ill according to the parents and the investigation, and the child was not under a doctor's care, and these medications had not been prescribed by a physician."
Dr. Riddick opined that the drugs in Douglas's system had been administered to him after 7:00 a.m. on the date of his death. He testified that if the drugs had been administered before Douglas had arrived at the day care the toxicological tests would not have disclosed the presence of the drugs in Douglas's system because the drugs would have been absorbed and metabolized. Dr. Riddick further stated that if the drugs had been administered before Douglas had arrived at the day care he would have become nonresponsive or have had a central-nervous-system depression upon his arrival at the day care. Dr. Riddick testified that Douglas would have been in physical distress during the process of aspirating and dying. The evidence further indicated that from the point Douglas aspirated the liquid into his lungs to his death would have been 15 to 20 minutes.
The Hernandezes filed a formal complaint with the Department on September 3, 2002, alleging that Douglas had been left unsupervised for a lengthy period at Poplin's day care and that that had contributed to his death. The Department investigated the complaint on October 4, 2002, and concluded that the complaint was "not indicated for inadequate supervision." Randall was not involved with the investigation regarding the complaint.
Subsequently, a second formal complaint alleging that Poplin had administered medication to a child without parental authorization was filed with the Department. Randall returned to the Poplin home day care on February 11, 2003, to investigate the second complaint. Poplin admitted that she had administered Tylenol brand acetaminophen to Douglas without a medical authorization from his parents. Randall found the complaint to be substantiated and completed a licensing-complaint-investigation form. Randall again reviewed with Poplin the Department's regulation against administering medication to a child without written medical authorization from the child's parents. The Department instituted a corrective plan, and Poplin agreed not to administer medication to a child without having a medication-authorization form on file. Randall also noted additional violations of the minimum standards during the February 11, 2003, visit. She completed a deficiency form at that time. Randall followed up with another visit to Poplin's day care on February 27, 2003. She confirmed that the violations noted on February 11 had been corrected by Poplin.
Ultimately, once the Department learned that Dr. Riddick had reclassified the manner of Douglas's death as a homicide caused by acute drug toxicity, it took action to suspend and ultimately to revoke Poplin's home-day-care license.
*661 The Hernandezes then filed their complaint, alleging wrongful death and fraud and seeking certain injunctive relief. Specifically, the complaint alleges that Randall failed to perform her ministerial duty and acted either negligently, willfully, illegally, or beyond her authority, or under a mistaken interpretation of the law when she: (1) failed to investigate Poplin's use of medication for children at the day care and falsely reported that she had investigated Poplin's use of medication; (2) failed to properly investigate whether the children were supervised at all times; (3) made a determination that supervising the children did not require that someone visually and/or audibly supervise the children; (4) failed to properly investigate Poplin's home day care at the time Poplin's day-care license was renewed; and (5) failed to advise and train Poplin to administer medication only after she had received written authorization from the child's parents. Regarding the fraud claim, the Hernandezes alleged that Randall: (1) entered notations on the licensing report that she knew or should have known were false; (2) falsely documented the evaluation of the Poplin home day care to indicate that Poplin was compliant in administering medication; and (3) misrepresented the findings of her licensing evaluation of Poplin's home day care, on which the Hernandezes relied to their detriment.
Randall moved for a summary judgment, asserting State-agent immunity as a defense. Following a hearing, the trial court, on October 20, 2007, entered an order denying Randall's summary-judgment motion and finding that a jury question was presented as to "whether or not defendant Randall followed proper departmental procedures regarding the evaluation forms for the day care. . . ." This petition followed.

Standard of Review
This Court has stated:
"`While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996). . . .
"`Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala.1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala.1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala.1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 (Ala.1992); and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala. 1998).
"`An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala.1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala.1992), Rowe v. Isbell, 599 So.2d 35 (Ala.1992).'"
Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002) (quoting Ex parte Rizk, 791 So.2d *662 911, 912-13 (Ala.2000)). A writ of mandamus is an extraordinary remedy available only when the petitioner demonstrates: "`(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.'" Ex parte Nall, 879 So.2d 541, 543 (Ala.2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala.2001)).

Discussion
In Ex parte Cranman, 792 So.2d 392 (Ala.2000), this Court restated the test for determining when a State employee is entitled to State-agent immunity:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; or
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."
792 So.2d at 405. Although Cranman was a plurality decision, the restatement of law as it pertains to State-agent immunity set forth in Cranman was subsequently adopted by this Court's decisions in Ex parte Rizk, 791 So.2d 911 (Ala.2000), and Ex parte Butts, 775 So.2d 173 (Ala.2000).
Additionally, this Court has stated:
"This Court has established a `burden-shifting' process when a party raises the defense of State-agent immunity. Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity. Giambrone, 874 So.2d at 1052; Ex parte Wood, 852 So.2d 705, 709 (Ala.2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, *663 in bad faith, or beyond his or her authority. Giambrone, 874 So.2d at 1052; Wood, 852 So.2d at 709; Ex parte Davis, 721 So.2d 685, 689 (Ala.1998). `A State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist."' Giambrone, 874 So.2d at 1052 (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000))."
Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006).
Randall argues that in evaluating the Poplin home day care for license renewal she complied with state law and with departmental policy; therefore, she argues, she is entitled to State-agent immunity as a matter of law. The Hernandezes argue that Randall is not entitled to State-agent immunity because, they say, she acted fraudulently and under a mistaken interpretation of the Department's policy, rules, and regulations in evaluating the Poplin home day care for purposes of renewing Poplin's license.

I. Randall's Alleged Failure to Require Written Medication-Authorization Forms

The Department's minimum standards require a home-day-care operator to obtain a written medication authorization from a child's parents before administering any medication to that child. The home-day-care operator is required by Department regulation to keep a copy of the written authorization in the child's records located at the day care for up to two years after the child leaves the day care. As required by law and the Department's regulations, Randall reviewed the records of the children in Poplin's care during her evaluation of Poplin's day care on April 9, 2002. Randall discovered during the review of the children's records that Poplin had no written medication-authorization forms on file. Rather than indicate that Poplin was noncompliant in failing to have any written medication-authorization forms, Randall indicated on the records checklist that this requirement was not applicable to Poplin. Randall explained that a written medication-authorization form was required to be in a child's records only if Poplin had administered medication to that child in the past. Randall's explanation of requiring a written medication-authorization form to be in a child's records only if Poplin had administered medication to the child is entirely consistent with the Department's policy against "blanket" authorization forms found in section E.2.d(1) of the Department's minimum standards.
Randall testified in her affidavit that she discussed with Poplin the Department's regulation that medication be administered to a child only after obtaining a written medication-authorization form from the child's parents and that Poplin assured her that she complied with that regulation. Randall indicated on the licensing-evaluation form that she had discussed with Poplin that regulation. Additionally, Randall confirmed that Poplin had a written operating policy for her home day care, as required by the Department, indicating that medication would be administered to a child only with written authorization from the child's parents.
The Hernandezes point to the facts that it is unlikely that Poplin had never had to administer medication to a child, that Poplin certified to Randall that she had a measuring device she used for administering medication, and that she certified to Randall that she returned medication to the parents when the medication was no longer needed, in support of their argument that Randall should have known that Poplin was administering medication to the *664 children in her care without first obtaining the written medication-authorization forms from the children's parents.
Randall's fault with regard to the matters forming the basis for this action is failing to probe more deeply to get to the truth. Of course, a reasonable person is not required to accept an improbable explanation in absence of proof to the contrary a reasonable person should reject such an explanation. The parents, when the evidence is viewed, as it must be, in their favor, have assembled facts that could reasonably support the conclusion that Randall was either quite gullible or negligent or perhaps even reckless in accepting Poplin's statements at face value and completing the licensing-evaluation form based on those statements. But no evidence suggests that Randall was in collusion with Poplin or that she had some impermissible motive "to look the other way." Randall's failure to detect that Poplin must have been administering medication without proper documentation is consistent only with negligent or wanton behavior.
This Court has previously held that poor judgment or wanton misconduct, an aggravated form of negligence, does not rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in Cranman. See Giambrone, 874 So.2d at 1057 (holding that State-agent immunity "is not abrogated for negligent and wanton behavior; instead, immunity is withheld only upon a showing that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority").
The dissenting opinion appears to treat as exhaustive the list illustrating the basis of immunity in Cranman. This Court in Howard v. City of Atmore, 887 So.2d 201, 206 (Ala.2003), rejected that notion by acknowledging that the list in Cranman was illustrative and not exhaustive. ("On its face, Cranman disclaims the rigidity, or exclusivity, attributed to it by Howard. In other words, Cranman states categories, but does not purport to set forth an exhaustive list of activities falling within each category.") Cranman is only a restatement; it is not a statute. Additionally, category (2) of Cranman refers to a State agent's "exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as" and there follow certain specific activities. 792 So.2d at 405 (emphasis added). Thus, Randall cannot be faulted for her failure to identify in her petition an illustration that applies neatly to her situation.
Randall was charged by statute with duties necessary to the administration of the Department. Randall did not erroneously report an objective fact, such as whether a swimming pool was enclosed by a fence, as was the case in Phillips v. Thomas, 555 So.2d 81, 86 (Ala.1989), in which immunity was denied. On the other hand, the ability to sift through false information in a way that elicits the truth is not on the same level of judgment in furtherance of a state activity analogous to electing between potholes while operating an automobile. See Town of Loxley v. Coleman, 720 So.2d 907 (Ala.1998) (holding that steering a police vehicle around potholes does not involve the type of judgment to which immunity applies). A good case has been made that Randall exercised poor judgment in the discharge of duties imposed upon her by statute. However, these circumstances are insufficient to deprive her of State-agent immunity under Cranman. The dissent would deny immunity to a State agent who would have clearly been entitled to immunity before this Court's restatement of Cranman.
*665 The Hernandezes have failed to present substantial evidence indicating that Randall acted willfully, maliciously, fraudulently, in bad faith, or beyond her authority, or under a misinterpretation of the law in discharging her duties in completing the Department's licensing-evaluation form as it pertained to the Department's policy requiring day-care operators to obtain written medication-authorization forms before administering medication to children in their care. Reynolds, supra. Accordingly, we conclude that Randall is entitled to State-agent immunity as to all claims asserted by the Hernandezes arising out of the alleged failure to require the written medication-authorization forms. Cranman, supra.
II. Randall's Alleged Failure to Determine that the Children At Poplin's Day Care Were Improperly Supervised
The Hernandezes contend that Poplin's day care was continuously understaffed and that Randall failed to detect this deficiency. Because Poplin operated a home day care, the Department's minimum standards required her to have, in addition to herself, an assistant caregiver and at least two substitutes on her staff. Randall confirmed that Pope was employed by Poplin as the assistant caregiver and that Clifton Poplin and Margaret Hackney were on staff as substitutes. Because Randall knew that Clifton was employed outside the day-care home, she required Poplin to provide a confirmation letter from Clifton's employer stating that Clifton would be available to assist in the day care when he was needed. Poplin's assistant caregiver and two substitutes were listed on the operating policy of the home day care. Accordingly, Poplin's home day care was appropriately staffed.
The Hernandezes further argue that had Randall done even a cursory investigation by speaking with Pope or Clifton she would have discovered that Pope was absent from the home day care for three hours a day, and she would therefore have been required to indicate Poplin's noncompliance with the Department's staffing regulation on the deficiency report. The Hernandezes argument assumes that Pope's absence from the home day care for three hours per day violated a Department regulation. Section H.3. of the Department's minimum standards required only that Poplin and the assistant caregiver be present and supervising the children when seven or more children were present. However, if Poplin chose to use a substitute, then the Department's minimum standards required that either Poplin or the assistant caregiver be present and supervising the children with the substitute. Randall testified that if Clifton was used as a substitute three hours a day for five days a week, Poplin would not be in violation of the Department's minimum standards regarding the use of substitutes. She further stated that there was no Department regulation regarding how often a substitute could be used by a licensee, so long as either the licensee or the assistant caregiver was present with the substitute. The Hernandezes have presented no evidence to the contrary.
Additionally, the Hernandezes have presented no Department regulation requiring Randall to confirm the work schedules of employees at the day care. All the licensing-evaluation form requires Randall to do in regard to staffing is to discuss with Poplin, to observe, or to certify that at least two adults are present and supervising the children when seven or more children are present and that either the licensee or assistant caregiver be present if a substitute is being used. Randall complied with the licensing-evaluation form by indicating *666 that she had discussed that requirement with Poplin.
We conclude that the Hernandezes have failed to present substantial evidence creating a question of fact as to whether Randall acted beyond her authority or under a misinterpretation of the law in discharging her duties of completing the Department's licensing-evaluation form as it pertained to the staffing and supervision requirements of the Department's minimum standards. Reynolds, supra. We further conclude that Randall is entitled to State-agent immunity as to all claims asserted by the Hernandezes arising out of the alleged failure to properly supervise. Cranman, supra.

III. Randall's Alleged Fraudulent Misrepresentations in Completing the Licensing-Evaluation Form

The Hernandezes contend that Randall fraudulently completed the licensing-evaluation form and made fraudulent misrepresentations on the form about Poplin's compliance with the Department's minimum standards. In order to survive a summary judgment on a fraud claim, a plaintiff must present substantial evidence indicating that there was a genuine issue of material fact as to whether the defendant: (1) made a misrepresentation; (2) of a material existing fact; (3) upon which the plaintiff reasonably relied; (4) which proximately caused injury or damage to the plaintiff. Byrd v. Lamar, 846 So.2d 334 (Ala.2002).
The Hernandezes specifically contend that "deficiencies existed that were never listed nor corrected because Randall did not perform the duties that she indicated on the evaluation form [that] she had performed." As discussed above, this Court has concluded that the Hernandezes have failed to present substantial evidence creating a question of fact as to whether Randall acted beyond her authority or under a misinterpretation of the law in discharging her duties when she evaluated Poplin's home day care for the purpose of renewing Poplin's license. Further, the Hernandezes have failed to present any evidence indicating that any deficiencies existed in the day care that were not properly identified by Randall and required to be corrected. Accordingly, we conclude that Randall made no misrepresentations in completing the licensing-evaluation form that could have been relied on by the Hernandezes, and the fraud claim therefore fails as a matter of law.

Conclusion
Randall is entitled to State-agent immunity as to the claims asserted against her by the Hernandezes. Because she has demonstrated a clear legal right to the relief sought, we grant the petition and issue the writ of mandamus.
PETITION GRANTED; WRIT ISSUED.
LYONS, WOODALL, STUART, SMITH, and PARKER, JJ., concur.
SEE, J., concurs specially.
COBB, C.J., and MURDOCK, J., dissent.
SEE, Justice (concurring specially).
I concur in the main opinion.
The main opinion concludes that Hattie Randall's conduct in completing the licensing-evaluation forms used by the Mobile County Department of Human Resources falls within the protection of State-agent immunity, citing Ex parte Cranman, 792 So.2d 392 (Ala.2000). The respondents object, with good reason, to the plausibility of some of the answers Randall reported on the licensing-evaluation forms. Justice Murdock notes in his dissent that *667 Randall's conduct does not readily fit within any of the Cranman categories, but comes closest to fitting into category (3), "discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner." Cranman, 792 So.2d at 405. He states that, "In general, these statutes and regulations left Randall with significant discretion as to the manner in which she was to examine and investigate the day care and then formulate and record her findings and recommendations." 971 So.2d at 673.
If it is necessary to squeeze Randall's conduct into category (3), I would note that we must be careful when considering acts that are either ministerial or discretionary in their fundamental nature that we do not so finely reduce them into ministerial and discretionary components that we effectively abolish State-agent immunity. See Swan v. City of Hueytown, 920 So.2d 1075, 1081 ("Breaking discretionary actions into increasingly minute ministerial components circumvents the intention of Article I, § 14, Ala. Const.1901." (footnote omitted)). Every task can be minutely disaggregated and inspected piece by piece, requiring the State actor to defend each component action that does not partake of the discretionaryor, as here, the ministerialnature of the Cranman category under which the general act is immunized.
It is our charge to determine the intent of the Constitution and to apply it as intended. We are charged to do so whether we agree or disagree with the policy embodied in it.[5] The Constitution of Alabama states "[t]hat the state of Alabama shall never be made defendant in any court of law or equity." Art. 1, § 14, Ala. Const. of 1901. "The wall of `governmental immunity' is almost invincible, made so by the people through their Constitution as interpreted by this Court." Hutchinson v. Board of Trs. of Univ. of Alabama, 288 Ala. 20, 24, 256 So.2d 281, 284 (1971). Moreover, "`[o]ne of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit.'" Ryan v. Hayes, 831 So.2d 21, 31 (Ala.2002) (quoting Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). Therefore, I would recognize Randall's actions in completing the Department licensing-evaluation forms as falling within Cranman category (3), "discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner," notwithstanding that she was required to exercise some discretion in how to fill out the forms, in how deeply to dig for the information needed to complete the forms, and in what answers to accept at face value or to reject as too improbable. It is not necessary, however, to labor this point.
The main opinion reminds us that it was the intention of this Court, in Cranman, to "restate the rule governing State-agent *668 immunity." 792 So.2d at 405. Based on the prior caselaw, Cranman enumerated five categories of conduct in which a State agent is "immune from civil liability in his or her personal capacity."[6] The main opinion relies on the Cranman restatement to support its holding that Randall is immune from suit. Although I originally dissented in Cranman,[7] I have since concurred. Ex parte Mobile County Dep't of Human Res., 815 So.2d 527, 532 (See, J., concurring specially) ("Although I disagreed with the discretionary-immunity rule suggested by the plurality in Ex parte Cranman, 792 So.2d 392, 413-17 (Ala.2000) (See, J., dissenting opinion), and subsequently adopted by this Court in Ex parte Butts, 775 So.2d 173, at 177-78 (Ala.2000), it is now the law of the State of Alabama. I therefore concur."). The main opinion states that the Cranman categories are not exhaustive, citing Howard v. City of Atmore, 887 So.2d 201, 206 (Ala.2003) ("On its face, Cranman disclaims the rigidity, or exclusivity, attributed to it by Howard. In other words, Cranman states categories, but does not purport to set forth an exhaustive list of activities falling within each category."). Indeed, Cranman itself recognizes that it is not intended to change the law, but to restate it. Cranman, 792 So.2d at 405 ("We therefore restate the rule governing State-agent immunity.").[8] I believe that the result in this case is consistent with the Alabama caselaw interpreting the doctrine of State-agent immunity. *669 See, e.g., Ex parte Sawyer, 876 So.2d 433 (Ala.2003) (relying on Cranman to issue writ of mandamus dismissing claims against the commissioner of the Department of Mental Health and Mental Retardation in her individual capacity for failing to establish policies that would have prevented an attack on a nursing-home resident by a fellow nursing-home resident); Ex parte Blankenship, 806 So.2d 1186 (Ala.2000) (relying on Cranman to direct the trial court to enter a summary judgment in favor of school principal and band director as to claims against them in their individual capacities in educating students). Therefore, I concur.
MURDOCK, Justice (dissenting).

Application of the Cranman Rule

The main opinion in Ex parte Cranman, 792 So.2d 392, 404-05 (Ala.2000), states as follows:
"We cannot, in blind obedience to the doctrine of stare decisis, continue to accept an expansive application of caselaw characterizing as a discretionary function conduct remote from the execution of governmental policy; to do so would perpetuate an erroneous construction of the Constitution. The time has come to face the necessity of defining `injury,' as that word is used in § 13[, Ala. Const. 1901], in lawsuits against State employees alleging torts committed in the line of duty, in a manner that neither violates § 13 nor prefers § 14[, Ala. Const. 1901,] or § 6.01 of the Judicial Article over § 13. We decline to label all discretionary acts by an agent of the State, or all acts by such an agent involving skill or judgment, as `immune' simply because the State has empowered the agent to act. Such an expansive view of the power of the State to act with immunity for its agents would be inconsistent with the rights secured by § 13.
"We therefore restate the rule governing State-agent immunity:
"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"(1) formulating plans, policies, or designs; . . .
"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as
"(a) making administrative adjudications;
"(b) allocating resources;
"(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; . . .
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; . . .
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; [and]
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students."
(Citations omitted.) In Ex parte Butts, 775 So.2d 173 (Ala.2000), a majority of the Court adopted Cranman's statement of the State-agent-immunity test.
Under the rule of State-agent immunity as formulated in Cranman and adopted in Butts, Hattie Randall was entitled to a summary judgment only if she demonstrated *670 to the trial court that her conduct fell within one of the above-quoted five categories. The main opinion criticizes this dissent for "appear[ing] to treat as exhaustive the list illustrating the basis of immunity in Cranman." 971 So.2d at 664 (emphasis added). Given the language and structure of the rule of immunity expressed in Cranman, I am uncertain what is meant by the suggestion that "the list" in Cranman is not "exhaustive." Admittedly, categories (2) and (4) each describe conduct of a certain nature and then give their own nonexhaustive "list" of examples. These examples, however, are only examples of conduct that falls within those respective categories. The other three categories contain no such list of examples. My point, however, is that to fall within one of the five categories, a defendant's conduct must meet the description provided by that category, and it is clear from the language and structure used in Cranman that the five categories articulated constitute the entirety of the immunity rule. See also Butts, supra; note 17 and accompanying text, infra. If this Court is of the opinion that there is or should be some additional catchall category for the discretionary execution of governmental policy generally, it is incumbent upon us to so state and to express the parameters of that category.
Although Randall quotes the Cranman test in its entirety in her brief to this Court, Randall does not expressly identify the particular category into which she contends her conduct falls. She does not argue that she was "formulating plans, policies, or designs" (category (1)); that she was "exercising . . . her judgment in the administration of a department or agency of government" (category (2)); that she was "exercising judgment in the enforcement of the criminal laws" (category (4)); or that she was "exercising judgment" in "releasing prisoners, counseling or releasing persons of unsound mind, or educating students" (category (5)). Presumably Randall makes no argument that her conduct falls within one of these categories for the simple reason that the plain language of these categories does not allow for any such argument. Randall was not making policy as contemplated by category (1). Unlike category (1), categories (2), (4), and (5) contemplate the exercise of judgment or discretion in the execution of certain laws or policies specifically identified in those categories or the administration of a department or agency. Although Randall arguably was indeed "exercising judgment" and discretion in the execution of governmental policy, she simply was not exercising judgment as to any of those three Cranman categories, i.e., categories (2), (4), and (5).[9]
*671 Unable to fit her conduct in any other Cranman category, and without specifically referring to category (3), Randall would apparently have this Court treat her conduct as falling into that category, i.e., as the performance of duties in a manner that is prescribed by statute, rule, or regulation. Randall states in her petition to this Court that she "has presented evidence of compliance with agency policies" (petition at 11) and that she "established by her affidavit and by attached documentation that her actions were in accord with DHR [Department of Human Resources] policy and state law." (Petition at 12.) According to Randall, "[t]he [Hernandezes] have presented no evidence, much less substantial evidence, that Randall failed to complete the form according to DHR policy or failed to write down a code required by DHR policy." (Petition at 17.) She also argues that, "[a]t all times," she "acted within DHR policy as stated by her supervisors, DHR written policy, and DHR legal counsel." (Petition at 18.)[10]
Randall was entitled to a summary judgment based on the third category of Cranman, however, only if she showed the trial court (1) that she was performing duties "imposed on" the Department of Human Resources ("the Department") by a "statute, rule, or regulation"; (2) that the "statute, rule, or regulation prescribe[d] the manner for performing the duties"; and (3) that there was no issue of material fact as to whether she performed the prescribed duties in the prescribed manner. The trial court decided that Randall had not made the required showing. Randall is entitled to the issuance by this Court of an extraordinary writ in the nature of mandamus only if she has demonstrated to us a "clear legal right to relief" from that decision, Ex parte Children's Hosp. of Alabama, 931 So.2d 1, 8 (Ala.2005), or, in other words, that there is "`"no reasonable basis for controversy about the right to [such] relief."'" Ex parte Vance, 900 So.2d 394, 399 (Ala.2004) (quoting other cases). I conclude that she has not done so.
The statutes and regulations governing the renewal of a license to operate a "Family Day Care" impose upon the Department a duty to inspect and investigate day-care facilities to assess whether those facilities meet certain minimum standards. See Ala. Admin. Code (Department of Human Resources), r. 660-5-27-.03(4), -.03(9)(d), and -.03(10); see also Ala.Code 1975, §§ 38-7-6(b) and 38-7-11. After reviewing the materials before this Court and the pertinent state statutes and day-care-licensing regulations issued by the Department, see generally Ala.Code 1975, § 38-7-1 et seq. and Ala. Admin. Code (Department of Human Resources), r. 660-5-27-.01 et seq., I cannot conclude that the "statutes, rules, and regulations" governing the Department's day-care-licensing program fully "prescribed the manner" in which Randall was required to perform her investigation of Poplin's facility. Instead, Randall was left with significant discretion in how to conduct her investigation.[11]See Phillips v. Thomas, 555 So.2d *672 81, 86 (Ala.1989) (recognizing that under the above-described statutes, the investigation of a day-care facility by a social worker employed by the Department entails both discretionary and ministerial components).
Section 38-7-4, Ala.Code 1975, provides, in part:
"Application for such license or approval to operate a child-care facility shall be made to the department in the manner and on forms prescribed by it. The department, upon receiving such application, shall examine the premises of the child-care facility, including buildings, equipment, furnishings and appliances thereof and shall investigate the persons responsible for the care of children therein. If, upon such examination of the facility and investigation of the persons responsible for care of children, the department is satisfied that the facility and the responsible persons reasonably meet standards prescribed for the type of child-care facility for which application is made, the department shall issue a license or an approval in the proper form, designating on said license or approval the type of child-care facility and, except for a child-placing agency, the number of children to be served at any one time."
(Emphasis added.) As to a license-renewal reexamination, the licensing statute provides:
"The department shall reexamine every child-care facility for renewal of license or approval, including in that process, but not limited to, the examination of the premises and records of the facility and the persons responsible for the care of children as the department considers necessary to determine that minimum standards for licensing or approval continue to be met. . . . If the department or the licensed child-placing agency, as the case may be, is satisfied that the facility continues to meet and maintain minimum standards which the department prescribes and publishes, the department shall renew the license or approval to operate the facility or the licensed child-placing agency shall renew its approval of a boarding home."
Ala.Code 1975, § 38-7-6(b) (emphasis added). Section 38-7-11 provides that the Department's inspection
"shall include, but not be limited to, premises, services, personnel, program, accounts and records, interviews with agents and employees of the child-care facility being inspected and interviews with any child or other person within the custody or control of said child-care facility. Such inspection shall be made at any reasonable time, without prior notice, and as often as necessary to enforce and administer the provisions of this chapter. . . . If any such inspection . . . discloses any condition, deficiency, dereliction or abuse which is, or could be, hazardous to the health, the safety or the physical, moral or mental well-being of the children in the care of the child-care facility being inspected, the same shall at once be brought to the attention of the department. . . . "
The regulations add that
"[i]f an inspection, evaluation, or investigation indicates non-compliance with the minimum standards (deficiency), a deficiency report shall be prepared by the Department. . . . In any visit to the home in which deficiencies are observed or noted, the licensing representative shall complete a deficiency report, and discuss the deficiencies observed or noted *673 with the licensee or facility representative."
Ala. Admin. Code (Department of Human Resources), r. 660-5-27-.11(3).[12]
In general, these statutes and regulations left Randall with significant discretion as to the manner in which she was to examine and investigate the day care and then formulate and record her findings and recommendations. First and foremost, the above-quoted statutes and regulations did not limit Randall's responsibilities merely to the completion of the questionnaire at issue.[13]
Even if we focus solely upon the issue of the questionnaire, and even if the general act of completing that questionnaire was ministerial in the sense that Randall had no discretion but to complete it, nothing in the statutes and regulations required Randall merely to pose certain questions to Poplin about her compliance with day-care-facility requirements and then unquestioningly record and report Poplin's responses. Randall had discretion as to whether to accept at face value what Poplin told her or, if she had reason to question its credibility, to pursue such further examination as Randall, in her discretion, might deem warranted. Nor did the rules and regulations limit Randall in what other information she could elicit, or should view as reliable, in completing her investigation generally, or in completing specific forms. The statutes and regulations did not dictate to Randall under what circumstances she should or should not extend her investigation, based on either her observation of conditions at the facility or other information she might, in her discretion, elicit from the operator of the day-care facility, its other employees, or its clients.
Furthermore, the statutes and regulations do not prescribe exactly how Randall should complete the aforesaid investigative forms. In fact, the form titled "Child Care Home Licensing Evaluation" contains eight pages of boxes to be checked, prefaced by the heading "Sections to be completed at the discretion of the [Department] Licensing Representative." (Emphasis added.) Randall herself testified by affidavit that certain "codes" on the form were interchangeable and that the use of those codes was left to her discretion.[14]
*674 In Phillips, this Court made clear that the duty of an employee of the Department to investigate a day-care facility partakes of both discretionary and nondiscretionary activities. That case involved the assertion of State-agent immunity by Pittman, the director of the Department's Family and Children's Services Division, and Thomas, a State employee assigned to the Office of Daycare, presumably within that division. With respect to a claim against Pittman for negligently training and supervising Thomas, this Court had "little difficulty concluding that the exercise of such function is, for the most part, discretionary in nature" and, "to that extent, afford[ed] Pittman substantive immunity" under the pre-Cranman "discretionary public function" formulation of the immunity rule. 555 So.2d at 85 (emphasis added) (recognizing that Pittman's duty, in some respects, "required constant decision making and judgment" but, "[a]t the same time," included functions that could "be composed of ministerial acts").
Moreover, the opinion in Phillips then proceeds to analyze the statutes at issue here and to discuss Thomas's claims of immunity for her direct role in inspecting a day-care facility. The opinion first quotes Ala.Code 1975, § 38-7-4, which I have quoted above. Phillips then states:
"As concerns the inspection of day care facilities, § 38-7-11 provides, in part, as follows:
"` . . . Such inspection shall include, but not be limited to, premises, services, personnel, program, accounts and records, interviews with agents and employees of the child-care facility being inspected and interviews with any child or other person within the custody or control of said child-care facility. Such inspection shall be made at any reasonable time, without prior notice, and as often as necessary to enforce and administer the provisions of this chapter. . . . If any such inspection of a licensed or approved child-care facility discloses any condition, deficiency, dereliction or abuse which is, or could be, hazardous to the health, the safety or the physical, moral or mental well-being of the children in the care of the child-care facility being inspected, the same shall at once be brought to the attention of the department, and the department shall have the power to revoke without notice the license or approval or six-month permit of such child-care facility.' (Emphasis added.)
"Again, we recognize that these duties, although affirmative in nature, do require a considerable degree of discretion within department guidelines. Cf., Grant [v. Davis], 537 So.2d 7, 10 (Ala. 1988). Again, we also recognize that they can be composed of ministerial components."
555 So.2d at 85-86 (final emphasis added) (ultimately concluding that Thomas could be personally liable for negligently performing *675 the "ministerial act" of completing the questionnaire in that case when she wrongly reported that the pool at the facility was enclosed by a fence).[15]
Poplin was required to maintain the following documents for each child currently enrolled in her day care and for each child who had been enrolled in the day care during the preceding two years: (a) preadmission forms, (b) immunization certificates, and (c) medication-authorization forms. See Ala. Admin. Code (Department of Human Resources), r. 660-5-27-.07(9)(g) and -.07(9)(h). According to the evaluation forms completed by Randall as to the 12 children who were enrolled in Poplin's day care when Randall investigated the facility, however, Poplin did not possess preadmission forms for any of those 12 children. Further, Poplin was not in possession of the required immunization certificates for 10 of those 12 children. Notwithstanding this record of noncompliance, Randall exercised her discretion and chose to accept at face value Poplin's explanation for the absence of any medication-authorization forms, namely, that Poplin had not administered any medication to any of the children then in her care. Based on Randall's acceptance of this representation at face value, she proceeded to report to the Department that the requirement for maintenance of medication-authorization forms was "not applicable" to Poplin. Given the undisputed evidence of Poplin's failure to comply with the Department's record-keeping requirements as to preadmission forms and immunization certificates, however, Randall could have exercised her discretion so as to not accept Poplin's explanation for the absence of medication-authorization forms but to instead conduct further inquiries and/or to note concerns in her report.
Further, Randall admitted that she did not review the records of children who had been in Poplin's day-care facility during the two years before her visit, but who were not enrolled in the day care at the time Randall performed her investigation. As to this deficiency, Randall cannot have it both ways. If the duty to examine the "records of the facility" under § 38-7-6, as part of the overall investigative effort, was a particular task prescribed by statute, then Randall's failure to perform it would not be protected by category (3) immunity. On the other hand, if Randall's discretion in investigating the facility extended to the decision whether to review those records, *676 category (3) immunity would not protect Randall if, in light of Poplin's failure to comply with other record-keeping requirements, Randall were found negligent for failing to review them.[16]
Based on the foregoing, I cannot conclude that Randall has made a showing of a "clear right to relief"one as to which there is "no reasonable basis for controversy." In my view, her responsibilities were fundamentally discretionary in nature and therefore were not protected under the plain language of the third Cranman category. Under pre-Cranman precedents, discretion was the very characteristic that led to protection for the employee's conduct under the "discretionary public function" formulation of the immunity rule. Compare Phillips, supra; Grant v. Davis, 537 So.2d 7 (Ala.1988); see also Restatement (Second) of Torts § 895D (1979) (providing, in pertinent part, that "[a] public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if (a) he is immune because he engaged in the exercise of a discretionary function"). Under the Cranman formulation of the immunity rule, it is that same characteristicdiscretionthat removes an employee's conduct from the only Cranman category at issue here, category (3).
Despite the difficulty of "squeezing" Randall's conduct into category (3) as articulated in Cranman, the main opinion and Justice See's special concurrence take comfort in the suggestions (1) that pre-Cranman decisional law would support the result reached here and (2) that Cranman was merely a "restatement" of that law. I agree with the former suggestion; I disagree with the latter. In point of fact, if this case were to be decided under the "discretionary public function" analysis utilized in pre-Cranman cases, the result would indeed be a finding of immunity. See Phillips, supra. If we remove from the calculus the dispute over whether the conduct at issue is fundamentally discretionary in nature or fundamentally ministerial, and we assume for the sake of discussion a hypothetical set of facts in which the Department and its employee are merely given the responsibility to investigate a day-care facility in whatever manner they, in their discretion, deem appropriate, the pre-Cranman discretionary-public-function analysis clearly would extend immunity to such conduct. See Phillips, supra; Grant, supra. For the reasons discussed above, however, category (3) in the Cranman "restatement" clearly would not provide immunity under such facts. Nor does any other Cranman category. Moreover, the fact that the reformulation of the immunity rule in Cranman was actually intended to alter preexisting decisional law was expressed in Cranman itself. After engaging in a thorough discussion of preexisting caselaw, the main opinion in Cranman explained its reformulation of the rule by stating as follows:
"We cannot, in blind obedience to the doctrine of stare decisis, continue to accept an expansive application of case-law *677 characterizing as a discretionary function conduct remote from the execution of governmental policy; to do so would perpetuate an erroneous construction of the Constitution. Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 42 (Ala.1998) (Lyons, J., concurring specially) (citing Gwin, White & Prince, Inc. v. Henneford, 305 U.S. 434, 454-55, 59 S.Ct. 325, 83 L.Ed. 272 (1939) (Black, J., dissenting)). The time has come to face the necessity of defining `injury,' as that word is used in § 13[, Ala. Const. 1901], in lawsuits against State employees alleging torts committed in the line of duty, in a manner that neither violates § 13 nor prefers § 14[, Ala. Const. 1901,] or § 6.01 of the Judicial Article over § 13. We decline to label all discretionary acts by an agent of the State, or all acts by such an agent involving skill or judgment, as `immune' simply because the State has empowered the agent to act. Such an expansive view of the power of the State to act with immunity for its agents would be inconsistent with the rights secured by § 13."
792 So.2d at 404-05 (emphasis added).
Based on the foregoing, I cannot conclude that Randall's petition for a writ of mandamus is due to be granted insofar as that petition is based upon her claim of State-agent immunity.

The Public-Duty Rule
In addition to her claim to State-agent immunity, however, Randall argues in her brief to this Court that, as a social worker engaged in licensing day-care facilities, she had no legal duty to the plaintiffs. Relying upon Alabama Department of Corrections v. Thompson, 855 So.2d 1016 (Ala. 2003), Randall argues that "[a]ny duty she owed was to the public at large and, therefore, insufficient to support a claim for negligence."[17]
*678 Even if there is merit to Randall's public-duty-rule argument, this case is before us on a petition for a writ of mandamus. As the main opinion notes, the general rule is that the denial of a motion for a summary judgment is not reviewable by a petition for writ of mandamus, but this Court has recognized an exception when the motion is grounded on a claim of immunity. 971 So.2d at 661 (quoting Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002)). Randall does not invoke the public-duty rule to urge upon us some reformulation or other revision in the rule of immunity articulated in Cranman.[18]
Instead, Randall invokes the public-duty rule merely for the purpose of arguing that the plaintiffs cannot demonstrate one of the elements of their negligence claim, i.e., that Randall owed the plaintiffs a duty. See, e.g., Martin v. Arnold, 643 So.2d 564, 567 (Ala.1994). Accordingly, I do not believe Randall's public-duty-rule argument provides an appropriate basis for granting her petition for a writ of mandamus. See, e.g., Ex parte Haralson, 853 So.2d 928, 931 n. 2 (Ala.2003) (noting that, when a petition for a writ of mandamus is based on a claim of immunity, this Court does not address a petitioner's additional grounds for issuance of the writ that are not related to the immunity claim when the petitioner has an adequate remedy by way of appeal to assert those additional grounds).

The Issue of Wantonness
In addition to the analysis by which the main opinion concludes that Randall's conduct falls within one of the categories of immunized conduct prescribed in Cranman, the main opinion goes the further step of discussing one of the two exceptions to immunity also articulated in Cranman, see 792 So.2d at 405. Specifically, the main opinion concludes that Randall's conduct would not fall within the exception stated for acts committed "willfully, maliciously, fraudulently, in bad faith, beyond [the State agent's] authority, or under a mistaken interpretation of the law." Id. This is so, according to the main opinion, because Randall's conduct is "consistent only with negligent or wanton behavior." 971 So.2d at 664. The main opinion refers to wanton behavior as "an aggravated form of negligence" and cites this Court's 2003 decision in Giambrone v. Douglas, 874 So.2d 1046 (Ala.2003), for the proposition that such behavior does not deprive a State agent of immunity.
Neither the parents' complaint nor their briefs to this court assert wantonness as a ground for their wrongful-death claim. Nor has Randall discussed the issue of wantonness. Moreover, given the definition of wantonness, see discussion infra, it is not apparent that Randall's acts rise to that level. Nonetheless, because the main opinion addresses the issue, I likewise will comment on it.
According to Sellers v. Thompson, 452 So.2d 460, 462 n. 3 (Ala.1984),
"[i]n Deal v. Tannehill Furnace & Foundry Comm'n, 443 So.2d 1213 (Ala. 1983), we expanded the scope of discretionary function immunity to include allegations of wantonness on the part of State officials sued in their individual capacities where . . . there was no evidence of bad faith on the part of the officials."
(Emphasis added.) Neither Deal v. Tannehill Furnace & Foundry Comm'n, 443 *679 So.2d 1213 (Ala.1983), nor Sellers, however, discusses by what authority this Court was compelled, or should have been persuaded, to expand the scope of discretionary-function immunity so as to exclude wantonness claims. Moreover, on its facts Deal appears to involve only negligence on the part of the individual defendants. There is no suggestion in the facts that those defendants acted wantonly, as that term has come to be understood, i.e., involving acts committed willfully with a conscious realization that injury likely or probably will result. See discussion, infra. Furthermore, the context in which Deal uses the terms "wantonness" and "good faith," see 443 So.2d at 1215 and 1218, and Sellers uses the term "bad faith," see 452 So.2d at 462 n. 3, suggest that those cases were attempting merely to distinguish between acts of mere inadvertence, or negligence, on the one hand, and acts committed in bad faith in the sense of a conscious disregard for the safety of others. Compare Stiebitz v. Mahoney, 144 Conn. 443, 448, 134 A.2d 71, 74 (1957) (noting that "the law clothed [the State agent] with immunity from liability for his official acts, performed in the use of a delegated discretion, as long as they were done `in good faith, in the exercise of an honest judgment, and not in abuse of . . . discretion, or maliciously or wantonly.' Wadsworth v. Town of Middletown, 94 Conn. 435, 439, 109 A. 246, 248 [ (1920)]." (emphasis added)).
This Court has recognized that wantonness is qualitatively different from, and is more than an aggravated form of, negligence. Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145-46 (Ala.1987). "`Wantonness' has been defined by this Court as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256 (Ala.1998) (emphasis added); see also Ala.Code 1975, § 6-11-20 (defining wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others" (emphasis added)). Given this definition, I question whether wanton conduct is, and should be treated for immunity purposes as, more akin to acts committed "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law," than to mere negligence. This Court itself has grouped wantonness with both willfulness and recklessness. Indeed, given a proper understanding of the concept of willfulness and its relation to the meaning of wantonness, it may be that the Cranman exception for "willful" actions should be construed as including "wanton" conduct.[19] In Lynn Strickland, this Court explained:
"Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury. . . . As the Court stated in Smith v. Roland, 243 Ala. 400, 403, 10 So.2d 367, 369 (1942), quoting 5 Mayfield's Digest, p. 711, § 6:

*680 "`"Gross negligence" is negligence, not wantonness. Before one can be convicted of wantonness, the facts must show that he was conscious of his conduct and conscious from his knowledge of existing conditions that injury would likely or probably result from his conduct, [and] that with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury.'
"Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act."
510 So.2d at 145 (emphasis added). Black's Law Dictionary (5th ed. 1979), cited with approval in Lynn Strickland, explained that "`[negligence] is characterized chiefly by inadvertence, thoughtlessness, inattention and the like, while "wantonness" or "recklessness" is characterized by willfulness.'" 510 So.2d at 146.[20]
It may be considered ironic that we would judicially immunize wanton conduct by State officials while our legislature has reaffirmed that wantonness is the very type of conduct for which our civil law reserves the potentially heavy sanction of punitive damages. See Ala.Code 1975, § 6-11-20. Moreover, in so doing, the legislature grouped wanton conduct with, and considered it as meriting the same treatment as, acts committed "maliciously" and "fraudulently." Id. Further, in several contexts our legislature has specifically refused to extend qualified immunity as a defense to claims alleging wanton conduct. See Ala.Code 1975, § 6-5-663 (volunteer medical professionals); Ala.Code 1975, § 10-11-3 (noncompensated officers of nonprofit corporations); Ala.Code 1975, § 11-89C-8(d) (individuals acting on behalf of certain public corporations); Ala. Code 1975, § 25-4-113 (certain persons associated with the Department of Industrial Relations).
In short, I have serious doubts about whether, in order to protect executive discretion, it is necessary to protect the conduct of State officials who, with knowledge that injury or death likely or probably will result from their actions, act with a conscious disregard for the safety of others. Compare, e.g., Stiebitz, supra; Gilbert v. Richardson, 264 Ga. 744, 752, 452 S.E.2d 476, 482 (1994) ("The doctrine of official immunity, developed primarily in Georgia through case law, provides that while a public officer or employee may be personally *681 liable for his negligent ministerial acts, he may not be held liable for his discretionary acts unless such acts are willful, wanton, or outside the scope of his authority." (emphasis added)); Neal v. Donahue, 611 P.2d 1125, 1129 (Okla.1980) ("Although officers and employees of governmental agencies, including the State, are protected from tort liability while performing discretionary functions, such protection does not render such employees immune from liability for willful and wanton negligence." (footnotes omitted; emphasis added)); Bryant v. Duval County Hosp. Auth., 459 So.2d 1154 (Fla.Dist.Ct.App.1984) (construing a Florida statute as not immunizing actions performed in bad faith, with malice, or with willful and wanton disregard for the safety of others); Conley v. Shearer, 64 Ohio St.3d 284, 288, 595 N.E.2d 862, 866 (1992) (to like effect).

Conclusion
Based on the foregoing, I conclude that Randall has not demonstrated a clear legal right to a reversal of the trial court's decision denying her motion for a summary judgment. I therefore respectfully dissent.
COBB, C.J., concurs.
NOTES
[1] Randall states in her petition that the trial court has dismissed the Department and the commissioner as defendants.
[2] Section 38-7-6(b), Ala.Code 1975, provides, in pertinent part:

"(b) The department shall reexamine every child-care facility for renewal of license or approval, including in that process, but not limited to, the examination of the premises and records of the facility and the persons responsible for the care of children as the department considers necessary to determine that minimum standards for licensing or approval continue to be met. . . . If the department . . . is satisfied that the facility continues to meet and maintain minimum standards which the department prescribes and publishes, the department shall renew the license or approval to operate the facility. . . . "
[3] The Department prescribes numerous regulations in its "Minimum Standards for Family Day Care Homes" that a home-day-care provider must comply with in order to obtain or maintain licensing. See § 38-7-7, Ala.Code 1975. In order to ensure proper compliance with the Department's minimum standards, a licensing consultant is given an "Alabama Department of Human Resources Child Care Home Licensing Evaluation" form to be completed by the consultant during the home evaluations. The evaluation form lists the regulations that the home-day-care provider must comply with. Located adjacent to each regulation are three boxes that indicate "Compliance," "Non-compliance," and "Not Applicable." The licensing consultant completes the evaluation form by marking the appropriate box as it relates to the regulation with the code letters "O," "S," "D," and "X." "O" indicates that the licensing consultant observed compliance or noncompliance with the regulation. "S" indicates that the licensee certified compliance or non-compliance with the regulation. "D" indicates that the licensing consultant discussed compliance or noncompliance with the regulation with the licensee. "X" indicates that the regulation was not applicable or was not reviewed with the licensee. Randall testified that the codes "O," "S," "D," and "X" are "interchangeable" and that the decision to use an "O," "S," "D," or "X" in marking a box on the evaluation form is left to the discretion of the licensing consultant.
[4] Nothing in the Department's minimum standards prevents substitutes from being employed outside the group-day-care home.
[5] I would argue against including the doctrine of sovereign immunity in our State constitution. If we can expect private actors to live their lives and to carry out their business within the limits of the laws of the State, I do not see why we cannot expect the same of State actors. The State is every bit as capable of insuring itself as are private actors, and the full cost of the acts of the State should be borne by those who receive the benefit of the State action, not by those who have the misfortune, as here, to be the victims of the State actor's malfeasance.
[6] 

"(1) formulating plans, policies, or designs; . . .
"(2) exercising his or her judgment in the administration of a department or agency of government . . .
"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; . . .
"(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; [and]
"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students."
Cranman, 792 So.2d at 405.
[7] I wrote in that dissent that I believed the original per curiam opinion in Cranman, which was subsequently withdrawn, correctly restated the rule concerning State-agent immunity in relevant part as follows:

"`[A] governmental agent is immune from civil liability where the conduct made the basis of the claim against the agent is based upon the agent's formulation of plans, policies, or designs, or where the agent otherwise makes decisions such as those made in the context of the following activities:
"`(1) making administrative adjudications;
"`(2) allocating resources;
"`(3) negotiating contracts;
"`(4) hiring, firing, transferring, assigning, or supervising personnel;
"`(5) activities of law-enforcement or correctional officers in arresting, attempting to arrest, or releasing prisoners;
"`(6) all other instances where acts or decisions, including those concerning the safety, health, well-being, fitness, competence, development, or confinement of persons, cannot be challenged without imposing a burden arising from interference with a coequal branch of government that exceeds the benefit of the challenging party's right to a judicial remedy.'"
Cranman, 792 So.2d at 415 (See, J., dissenting). This restatement of the doctrine of State-agent immunity, I believe, reflects that Randall's behavior is covered by the doctrine.
[8] We are without the power to change the law of sovereign immunity that appears in the Constitution of Alabama, but are bound by it. Ala. Const. of 1901, Art. XVI, § 279 ("all officers, executive and judicial, [are required to] take the following oath or affirmation: `I, _______, solemnly swear . . . that I will support the Constitution of the United States, and the Constitution of the State of Alabama . . . and that I will faithfully and honestly discharge the duties of the office upon which I am about to enter. . . . '").
[9] As the petitioner in this mandamus proceeding, Randall has the burden to demonstrate to this court a clear legal right to relief. See Ex parte Children's Hosp. of Alabama, 931 So.2d 1, 8 (Ala.2005). As discussed in the text, infra, the only Cranman category that her briefs to this Court suggest is applicable in this case is category (3). The main opinion, however, makes note of the fact that category (2) of Cranman "refers to a State agent's `exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as' and there follow certain specific activities." 971 So.2d at 662 (quoting Cranman, 792 So.2d at 405 (emphasis in main opinion)). I do not see how the fact that category (2) includes a nonexhaustive list of examples of conduct that fall within that category supports the conclusion in the main opinion "Randall cannot be faulted for her failure to identify in her petition an illustration that applies neatly to her situation" 971 So.2d at 664. Category (2), which involves the administration of a department or agency, simply is not applicable in this case. Randall, as the petitioner, makes no effort to meet her burden by reference to category (2), and, in any event, the wording of that category would not support such an effort.
[10] In this regard, Randall's position appears inconsistent with that of the social worker for the Department of Human Resources in Ex parte Trawick, 959 So.2d 51 (Ala.2006). In Trawick, this Court, among other things, upheld a trial court's order denying a motion for a summary judgment filed by a social worker for the Department who allegedly failed to properly investigate a day-care facility on the ground that "at no point [did the social worker] actually argue that she was required by law to engage in or to refrain from certain actions." 959 So.2d at 56.
[11] Given the specific language used for category (3) immunity (including the absence of any qualifying "exercising judgment" language found in categories (2), (4), and (5)), category (3) does not apply to the exercise of discretion in deciding how to perform a duty.
[12] The regulations also contain a detailed description of the minimum standards the day-care facility must meet. See Ala. Admin. Code (Department of Human Resources), r. 660-5-27-.04 through -.10 and r. 660-5-27-.13 through -.14.

I also note that, accepting for present purposes that the "Minimum Standards" manual that was provided to Randall by the Department and that Randall submitted with her petition contains "rules" of the nature contemplated by category (3), I see nothing in the manual that materially alters my view of the degree of discretion held by Randall in performing her investigative duties.
[13] In his special concurrence, Justice See refers to "Randall's conduct in completing the licensing-evaluation forms issued by the Mobile County Department of Human Resources." 971 So.2d at 666. The basis for my opinion in this case, however, is that Randall as a fundamental matter had responsibility for much more than merely the completion of a checklist or an evaluation form.
[14] Justice See states that "we must be careful when considering acts that are either ministerial or discretionary in their fundamental nature that we do not so finely reduce them into ministerial and discretionary components that we effectively abolish State-agent immunity," 971 So.2d at 667, a sentiment with which I agree. Justice See then states, however, that we should be careful not to "disaggregate[] and inspect[], piece by piece" every task in such a way as to "require[] the State actor to defend each component action that does not partake of the discretionaryor, as here, the ministerialnature of the Cranman category under which the general act is immunized." 971 So.2d at 667. The emphasized passage reflects an earlier suggestion in Justice See's writing that Randall's conduct involved merely the completion of evaluation forms. See note 13, supra. It presumes that the "fundamental nature" of Randall's activity "here" is "ministerial," and that we ought to be careful not to inspect piece by piece those portions of it which do "not partake of the . . . ministerial." My point, however, is that the "fundamental nature" of the responsibility with which the Department and Randall were chargedthe investigation and licensing of the day-care facilityis not ministerial, as it would have to be to fall within Cranman's category (3). Rather, this responsibility is "discretionary in its fundamental nature." As discussed, it involves much more than just the mechanical "complet[ion] of the licensing-evaluation forms." Even the completion of the evaluation forms, upon close examination, is seen to involve significant discretion.
[15] Although it too is a pre-Cranman case, Grant v. Davis, 537 So.2d 7 (Ala.1988), cited in Phillips, also is instructive. While in one aspect Grant addressed a function that "substantially part[ook] of planning level activities," 537 So.2d at 9, on a separate note the opinion addressed the duty of workers employed by the Alabama Department of Transportation ("ADOT") simply to inspect roadways for defects. Although manuals provided by ADOT required workers to make frequent inspections, the Court noted:

"The duty to inspect the roads is an affirmative duty but one that also involves a type of discretion giving rise to qualified immunity. In performing that function, the defendants are involved in determining the manner of carrying out these inspections, i.e., determining the method and means. Thus, they are carrying out the directives of the guidelines that they must follow by determining how the inspections are to be carried out. While the defendants have no discretion not to inspect, they do have the discretion to determine the practical method for inspecting each road."
537 So.2d at 10 (some emphasis original; some emphasis added). Although the State agent in Grant was performing a specific duty that was prescribed to him by law, the facts that he had significant discretion in how to perform that duty and that his alleged wrongdoing arose from the exercise of that discretion entitled him to immunity under the pre-Cranman formulation of discretionary public-function immunity.
[16] Even if we could construe the statutes and regulations at issue as prescribing to Randall the manner in which she was to perform all aspects of her investigation and the recording of information regarding the day care she was inspecting, it still could not reasonably be suggested that those statutes and regulations were intended to require Randall unquestioningly to accept and rely upon representations of the operator of a day-care facility that could not reasonably be considered credible. Compare Ex parte Trawick, 959 So.2d 51, 60 (Ala.2006) (See, J., joined by Smith, J., concurring in the rationale in part and concurring in the result) ("[The defendant social worker] cites no statute, rule, or regulation that put her under an obligation to misrepresent facts to [the plaintiff-parent]. . . ."); see also Phillips, supra.
[17] In Thompson, a prison warden and two correctional officers were sued for allowing the escape of an inmate who then broke into the plaintiff's home, assaulted her, and stole her automobile; the plaintiff sought compensatory and punitive damages. Although these individual defendants did not fall within any of the five categories of protected conduct articulated in Cranman and therefore were not entitled to a summary judgment on the ground of State-agent immunity, the defendants also argued to the trial court that they owed no duty to the plaintiff to protect her from the criminal acts of a third person. This Court agreed, holding that "state correctional officers owe a general duty to the public, not a duty to a specific person, to maintain custody of inmates." 855 So.2d at 1025. In so holding, this Court quoted with approval from the Michigan Court of Appeals' decision in Chivas v. Koehler, 182 Mich.App. 467, 453 N.W.2d 264 (1990), in which, among other things, the Michigan court explained that

"`generally a police officer does not owe a duty to any one individual. A police officer's duty is generally owed to the public and not to a specific individual. . . . Only where a special relationship between the parties exists which the law recognizes and defines as including a duty to conform to a particular standard of conduct toward another will a duty be recognized.'"
855 So.2d at 1023 (emphasis omitted).
The Thompson Court also found persuasive a decision of the South Carolina Court of Appeals referenced by Randall in her petition, Washington v. Lexington County Jail, 337 S.C. 400, 405-06, 523 S.E.2d 204, 206-07 (S.C.Ct. App.1999), in which the South Carolina court explained
"`Under the public duty rule, public officials are generally not held liable to individuals for negligence in discharging public duties because the duty is owed to the public at large and not to any one individual. "The public duty rule is a negative defense which denies an element of the plaintiff's cause of actionthe existence of a duty to the individual plaintiff. . . . "
"`. . . .
"`An exception to the public duty rule, however, is recognized when a plaintiff can establish that the defendant owed him an individual or special duty of care.'"
855 So.2d at 1024 (citations and emphasis omitted).
[18] It may well be that the "public-duty rule" would ultimately provide protection from liability in many of the same cases as would the pre-Cranman "discretionary-public-function" test. Neither that question nor the proposition that we somehow should utilize the public-duty rule as a basis for reformulating or revising the rule of immunity is before us, however.
[19] This conclusion arguably is bolstered by the use of the term "willfully" in a list that includes acts done "maliciously, fraudulently, in bad faith, beyond authority, and under mistaken interpretations of law." 792 So.2d at 405. Cf. Ex parte Emerald Mountain Expressway Bridge, L.L.C., 856 So.2d 834 (Ala. 2003) (discussing the principles of context, noscitur a sociis, and ejusdem generis in relation to statutory construction).
[20] In Lynn Strickland, 510 So.2d at 146, this Court discussed other primary and secondary authorities explaining the concept of wantonness in a way that implicates willful conduct, including: Thompson v. White, 274 Ala. 413, 420, 149 So.2d 797, 804 (1963) ("`[W]anton or willful misconduct implies mental action; whereas that fact is absent in mere negligence.'" (emphasis added)); Coleman v. Hamilton Storage Co., 235 Ala. 553, 559, 180 So. 553, 559 (1938) ("`The fact that defendant's servant was not guilty of negligence would not preclude a finding by the jury that he was guilty of willful or wanton conduct.'" (emphasis in Lynn Strickland omitted and emphasis added)); Prosser & Keeton on Torts 212 (5th ed. 1984) ("`["Willful," "wanton," and "reckless" misconduct] have been grouped together as an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care.'" (emphasis added in Lynn Strickland)); Speiser, Krause, and Gans, 3 The American Law of Torts, § 10.1 at 358 (1986) ("`While such a tort [wanton misconduct] has been labeled "willful negligence," "wanton and willful negligence," "wanton and willful misconduct," and even "gross negligence," it is most accurately designated as "wanton and reckless misconduct." As the Wyoming court puts it: While "ordinary" and "gross" negligence differ in degree "ordinary" negligence and "willful and wanton" misconduct differ in kind.'").